836 P.2d 551

**John G. HAAG and Mary N. Haag, husband and wife, Plaintiffs–Respondents,**

v.

**Steven H. POLLACK and Pettra W. Pollack, husband and wife, Defendants–Appellants,**

**Steven H. POLLACK and Pettra W. Pollack, husband and wife, and Thomas E. Howell and Maxine F. Howell, husband and wife, Counterclaimants–Third Party Plaintiffs–Appellants,**

v.

**John G. HAAG and Mary N. Haag, husband and wife, Counterdefendants–Third Party Defendants–Respondents.**

No. 19419.

Court of Appeals of Idaho.

Aug. 10, 1992.

Cosho, Humphrey, Greener & Welsh, Boise, for defendants-appellants. William M. Loomis, argued.

Foley & Lance, Chartered, Meridian, for plaintiffs-respondents. Howard R. Foley, argued.

## WALTERS, Chief Judge.

This case concerns the breach of a real estate sales contract and its prohibition against assignment without the seller's consent. The sellers are John and Mary Haag, plaintiffs-respondents in this action. In 1981, the buyers, defendants-appellants Steven and Pettra Pollack, entered into a "lease-purchase" agreement with Thomas and Maxine Howell, third party plaintiffs-appellants, and then in 1989 attempted to effect an assignment of the Haag contract to the Howells. The Haags sued, arguing that the earlier lease-purchase agreement was a disguised assignment made without their consent. The Pollacks and Howells counterclaimed and filed a third party complaint, alleging that the Haags had unreasonably withheld their consent to the later assignment. The jury found for the Haags and awarded $33,000 in damages, measured according to the payments the Haags

would have received if an unauthorized assignment had occurred in 1981. The Pollacks and Howells moved for a judgment notwithstanding the verdict and in the alternative for a new trial, both of which were denied. They appeal, arguing that the motions should have been granted because the evidence did not support the verdict and the court erroneously instructed the jury. We affirm.

## Issues ·

There are two issues presented on appeal in this case. First, we are asked to consider whether the court erred when it found sufficient evidence to support the verdict and denied the Pollacks' motion for judgment notwithstanding the verdict. The second question is whether the court erred when it instructed the jury as to the meaning of assignment and denied the Pollacks' motion for new trial.

## J.N.O.V.

A motion for judgment notwithstanding the verdict (j.n.o.v.) under I.R.C.P. 50(b) admits the truth of all adverse evidence. *Smith v. Praegitzer*, 113 Idaho 887, 889, 749 P.2d 1012, 1014 (Ct.App.1988). Every reasonable inference is drawn in the light most favorable to the non-moving party. *Id.* at 889–90, 749 P.2d at 1014–15. The question raised by the motion is whether there is substantial evidence upon which the jury could properly find a verdict for that party. *Id.* The requisite standard is whether the evidence is of sufficient quantity and probative value that reasonable minds could reach the same conclusion as did the jury. *Id.* In determining whether a j.n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which passed on the motion originally. *Id.* Accordingly, we exercise free review of the record, without deference to the views of the trial court, to determine whether the verdict can be supported under any reasonable view of the evidence. *Jones v. Panhandle Distributors*, 117 Idaho 750, 753, 792 P.2d 315, 318 (1990).

Drawing every reasonable inference in the Haags' favor, the record reveals the following facts. In 1978, the Haags entered into a contract for the sale of their Boise home to the Pollacks. The contract contained the following limitation:

> *ASSIGNMENT:* Buyers agree that they will not assign this Contract, either directly or indirectly, in whole or in part, without the prior written consent of the Sellers. Sellers agree that consent to assignment will not be withheld unreasonably. In the event of assignment, Sellers hereby reserve the right to then renegotiate the interest rate to a rate 1/4% under the current conventional interest rate then prevalent in the lending industry. In no event shall the interest rate be less than 9%.

After several years, the Pollacks wanted to move from the Haag home into a bigger one. They contacted the Haags to see if they would consent to an assignment. The Haags stated that they would "just as soon not," primarily because of their ages, and that they would rather sell outright. Beyond this quick and general inquiry, nothing more was said of the matter.

In 1981, the Howells, friends of the Pollacks, became financially distressed and decided to sell their home in which they had approximately $15,000 equity. At the same time, the Pollacks had about $15,000 equity in the home they were purchasing from the Haags. As Steven Pollack testified, the parties decided to "exchange equities" or interests in the two homes. No cash changed hands. The Pollacks gave their $15,000 in equity as a down payment and assumed the Howells' obligation on the Howell home. In turn, the Howells used their $15,000 in equity to buy from the Pollacks an option on the Haag–Pollack home. The agreement, entered into on October 30, 1981, was to give the Howells a two-year option to purchase the Haag–Pollack home for $52,500. The option was to expire on October 31, 1983. The Haags were not informed of this transaction, although they became aware that the Pollacks had moved from the house and were renting it to others. They did not object.

The Howells did not attempt to exercise the option between 1981 and 1983. Steven Pollack and Thomas Howell both testified at trial that the Howells' $15,000 option payment became the Pollacks' money to keep after October 31, 1983. However, Steven Pollack also expressed a contradictory view in his deposition. There, he testified that after the exchange of equities, all the Howells had to do was notify the Pollacks of their desire to buy and the Pollacks would start the paper work, apparently, even in the face of the expiration of the option and the six-year interval. He stated that if the Howells had chosen not to purchase the property he would have had to pay them $15,000 cash or some other compensation. Supporting this view, Thomas Howell stated in his deposition that he did not have to pay any more cash to the Pollacks after 1981, but just assume the Haags' contract and continue to pay approximately $400 a month to the Haags as the Pollacks had.

In her deposition, Maxine Howell related that they entered into the lease-option from the Pollacks because they wanted the option to purchase and, because she was a real estate agent, she could rent it to others easier than the Pollacks could. She essentially stated that their agreement to obtain ownership of the property was not limited to a two-year period but instead they had an oral understanding to keep the property rented and extend their option to purchase beyond that period. According to Maxine, when 1989 came around "we were able to make—or, to come through on the option, make a down payment and take over the contract."

The record reveals that once the Howells entered into the agreement with the Pollacks, the Howells never moved into the home. Instead, they elected to live in a condominium they owned in Boise, at a cost of $800 to $900 per month, despite finances so poor they claimed they could not afford to move into the Haag–Pollack home. Indications are that the Howells, after moving to California in search of better jobs, treated the home as a rental unit bought for investment purposes. They sublet the

Haag–Pollack home to various people until 1989. Throughout the 1980s, the Howells paid $404.30 per month to the Pollacks, who in turn sent $397 per month to the Haags. The record does not reveal whether the Howells' rent ever increased, although the value of the property did, or whether the amount was tied to the fixed payments the Pollacks made to the Haags.

The record does show that during the two-year term of the option contract, the Pollacks identified the money they received from the Howells as rental income on their tax returns. After 1983, however, no such reporting was made. Steven Pollack testified that he did not report the money as income because it was "a wash" when offset by the interest payments and depreciation on the contract. During that time, however, the Howells spent approximately $9,000 on maintenance for the home, including over $2,000 in 1989, an expense not usually borne by mere tenants. In September, 1989, the Howells claimed the home as an asset on a financial statement, that is, as a rental unit they owned with a value of $46,000, and a positive net worth to them of $20,000, also an act inconsistent with mere tenancy. Further, the Howells listed the house with the Boise City—Ada County Housing Authority as rental property and showed themselves as the owners. Countervailing testimony was presented, however, that this last act was the work of the housing authority agent, not the Howells.

By 1989, the Howells' finances had improved and the interest rate for home mortgages had fallen from 14.5% in 1981 to approximately 10.5% in 1989. The Howells told the Pollacks they were interested in buying the home and assuming the contract with the Haags. Steven Pollack testified at trial that in 1989 they did not discuss the equity question with the Howells because the Howells did not owe them "a new down payment." Apparently, the down payment from 1981 was still effective, as was the purchase option, which stated:

> (c) The purchase price of $52,500.00, less the sums paid hereunder as hereinabove recited, shall be paid as provided in the Real Estate Contract, a copy of which is attached hereto. . . .

In early August, 1989, the Pollacks called the Haags and asked generally if they would consent to an assignment. The Haags said that they would rather not and they would rather be cashed out; however, they did not refuse to consent. At that time, the Pollacks did not offer specifics about the proposed transaction. On August 16, the attorney for the Pollacks and Howells wrote a letter to the Haags informing them of the desired assignment. The Haags, who had been out of town, returned on August 30 to find the letter. They replied to the letter stating that if an assignment was to occur they wanted assurances of the Howells' financial stability. The attorney for the Pollacks and Howells then sent the Howells' credit report to the Haags. However, in response the Haags requested more comprehensive information. The Pollacks and Howells finally decided that the Haags were unreasonably withholding their consent to the assignment. Working from the perspective that the Haags' refusal to consent was a violation of the contract, the Pollacks and Howells executed an assignment and warranty deed on August 31, 1989. Thereafter, further negotiations were entered into in an attempt to get the Haags' consent. Discussions were had regarding the proper interest rate, the payment of taxes and insurance, and the payment by the Howells of approximately $150 in attorney fees the Haags had incurred attempting to assure compliance with the contract and obtaining information about the Howells' financial stability. Mrs. Haag stated that she did not learn of the assignment until December, 1989, when the Howells, not the Pollacks, made a house payment directly to the Haags.

Still, the Haags expressed a willingness to consent. Negotiations continued, then collapsed. The Haags filed this action, based on the theories that the Pollacks had actually assigned the contract to the Howells in 1981 by way of the lease-purchase agreement, alternatively that an assignment without consent occurred in 1989, and that the Pollacks had defaulted on the con-

tract. The Pollacks argued in response that the 1981 transaction was a mere lease and that the Haags had unreasonably withheld their consent to an assignment in 1989. The jury returned a verdict for the Haags.

■ An assignment, unlike a sublease, disposes of a lessee's entire interest in the leasehold, and does not reserve to the lessee any reversionary interest. *Fahrenwald v. LaBonte*, 103 Idaho 751, 753 n. 1, 653 P.2d 806, 808 n. 1 (Ct.App.1982). In other words, an assignment is a transfer of all of one's interest in property. *See* 6 AM.JUR.2D *Assignments* § 1, at 185 (1963). From our review of the record, we conclude that the evidence supports the view that the Pollacks, although purportedly doing otherwise, indirectly gave all of their interest in the home to the Howells in 1981. Apparently, the jury concluded that the equity exchange, which was supposed to finance a limited option to purchase, actually was a perpetual down payment with an option exercised at the Howells' choice, even years after the option was supposed to have expired. Although Steven Pollack testified that after the option expired he knew he could sell the property to anyone, reasonable minds could reach the same conclusion as the jury, that is, that the Pollacks had effectively given up their entire interest in the property to the Howells in 1981. Accordingly, the motion for j.n.o.v. was properly denied.

### New Trial

■ Next, we consider whether the court erred in denying the motion for new trial. On such a motion, unlike an application for j.n.o.v., the trial court has broad discretion to weigh the evidence and the credibility of witnesses, and it may set aside the verdict based upon its independent evaluation of the evidence even though there is substantial evidence to support the verdict. *Robertson v. Richards*, 115 Idaho 628, 631, 769 P.2d 505, 508 (1989); *Quick v. Crane*, 111 Idaho 759, 766–67, 727 P.2d 1187, 1194–95 (1986). When reviewing a denial of a motion for new trial, the appellate court's function is

to determine if the trial court manifestly abused its discretion. *Quick v. Crane*, 111 Idaho at 770, 727 P.2d at 1198.

■ In this case, the Pollacks contend they were entitled to a new trial because of an error committed by the trial court in giving instructions to the jury. *See* I.R.C.P. 59(a). We note, initially, that jury instructions must be considered as a whole to determine if they fairly and accurately reflect applicable law. *Westfall v. Caterpillar, Inc.*, 120 Idaho 918, 922, 821 P.2d 973, 977 (1991); *Bushong v. Kamiah Grain Inc.*, 96 Idaho 659, 661, 534 P.2d 1099, 1101 (1975). Litigants have a right to have the jury instructed on every reasonable theory presenting a basis of a claim, relief, or defense to a claim, where the theory is supported by the pleadings and evidence. *Garrett Freightlines v. Bannock Paving Co.*, 112 Idaho 722, 730–31, 735 P.2d 1033, 1041–42 (1987). Failure to instruct upon a party's theory of the case may be reversible error. *Id.* To constitute reversible error, however, the instructions must have misled the jury or prejudiced the complaining party. *Salinas v. Vierstra*, 107 Idaho 984, 991, 695 P.2d 369, 376 (1985).

Specifically, the Pollacks argue that the court's instructions misled the jury. They submit the jury should have been instructed that "under Idaho law a conditional lease with an option to purchase which requires that the optionee (the Howells) seek the optionor's (the Pollacks) consent prior to exercising the option does not amount to an assignment." The Pollacks quote *Groth v. Continental Oil Company*, 84 Idaho 409, 373 P.2d 548 (1962) for their proposed instruction on assignment, which states:

> An assignment of real property is a transfer or conveyance by the lessee, of his full term in the lease. If the transfer does not retain in the lessee a reversionary interest in the transferred estate, then the transfer is an assignment of the lease, and is not a sublease.

*Groth*, at 413, 373 P.2d 548. The Pollacks argue that by never explaining the legal implications flowing from an option to pur-

chase which required prior notice to the Pollacks, the jury was misled. They also assert that the pleadings and evidence support their requested instructions which essentially stated that a conditional option to purchase property does not convey in the optionee a present estate in the property until the option is exercised and, in turn, until the option is exercised, an assignment cannot occur.

The court's instructions in this case were brief. The sole instruction on assignment read:

> An assignment is a transfer or making over to another of the whole of any real property, or of any estate or interest therein.

The court did not use the words lease, sublease, or option in any of its instructions. Instead, the court simply instructed the jury that if it concluded an assignment occurred without the Haags' consent, the Pollacks had breached the contract.

Read as a whole, the instructions adequately explained to the jury the issue in the case in light of applicable Idaho law. The question presented was precisely what the court related: whether there was a breach of the Haag contract by the making of an assignment without consent. Even if there was a lease or option, that transaction could constitute a breach of the Haag–Pollack contract if the evidence supported the view that it in fact was an assignment. This case did not turn on the provisions of the lease-option agreement between the Pollack and the Howells, but how the parties acted in relation to the Haag–Pollack contract. We cannot say that the additional verbiage the Pollacks requested would have helped to clarify the matter for the jury, or that the omission misled the jury or prejudiced the Pollacks. The jury could have found an assignment or a lease notwithstanding the Pollacks' characterization of their relationship with the Howells, depending on the jury's view of the credibility of the Haags, Pollacks and Howells. It was possible, from the evidence presented, for the jury to determine that the Pollacks and Howells were not credible.

### Conclusion

There was substantial, competent evidence to support the verdict. The jury was properly instructed. Thus, we affirm the court's denial of the motions for j.n.o.v. and for a new trial. The Haags request attorney fees on appeal based on I.C. § 12–121 and under the terms of the Haag–Pollack contract. We do not find that the appeal was brought frivolously or without foundation as required under § 12–121, therefore we decline to award fees based on that standard. However, the Haag–Pollack contract provided:

> If either party hereto defaults in any manner or fails to fulfill any and all provisions of this Contract and the non-defaulting party places this Contract with an attorney to exercise any of the rights of the nondefaulting party upon such default or failure, or if suit be instituted or defended by the non-defaulting party by reason of, under or pertaining to such default or failure, then the non-defaulting party shall be entitled to recover reasonable attorneys' fees, costs and expenses from the defaulting party.

The jury found that the Pollacks had breached the contract by not fulfilling the obligation to obtain the Haags' prior written consent to the assignment, which the jury evidently determined had occurred in 1981. Because we conclude that the jury's verdict—finding that the Pollacks were in breach—is supported by substantial evidence, we also hold that the contract supports an award of attorney fees on appeal. Costs and attorney fees on appeal are awarded to the respondents, in amounts to be determined under I.A.R. 40 and 41.

SWANSTROM, J., and HURLBUTT, J. Pro Tem., concur.