**In re Jim Lee WIERSMA and Patricia Darlene Wiersma, Debtors.**

No. 01–41874.

United States Bankruptcy Court, D. Idaho.

Sept. 20, 2002.

Brent Robinson, Ling & Robinson, Rupert, Idaho, for Debtors.

Jeffrey E. Rolig, Twin Falls, Idaho, for United California Bank.

William R. Hollifield, Hollifield & Bevan, Twin Falls, Idaho, for O.H. Kruse.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Introduction

Debtors Jim Wiersma and Patty Wiersma (hereinafter "Debtors") filed a petition for relief under Chapter 11 of the Bankruptcy Code on October 1, 2001. A significant factor leading to Debtors' financial problems stems from the electrical work performed by Gietzen Electric, Inc. (hereinafter "Gietzen") at the Debtors' dairy. Apparently, as a result of Gietzen's alleged negligence in completing the job, Debtors' dairy cows were subjected to varying degrees of electric shocks. This ultimately caused the cows to produce a lower quantity and quality of milk, to become sick, and in some cases, to die. Debtors sued Gietzen in state court for their losses. Negotiations for settlement of that action have taken place, and Debtors received an offer from Gietzen to resolve their claim. Debtors have now filed a motion with the Court to approve the settlement. Docket No.

192. A hearing on approval of the settlement has not yet occurred. *See* Fed. R. Bankr.P. 9019(a) (requiring a motion, notice and a hearing as conditions of the Court's approval of a compromise by a trustee or debtor acting on behalf of the bankruptcy estate.)

On June 26, 2002, Debtors filed a Motion to Determine Secured Status (hereinafter "Motion") to establish the relative rights of Debtors and two of their creditors in any settlement proceeds generated by the Gietzen lawsuit. Docket No. 168. Those creditors are United California Bank (hereinafter "UCB") and O.H. Kruse Grain & Milling (hereinafter "O.H. Kruse"), both of whom assert an interest in Debtors' claim against, and in any recovery from, Gietzen.

On July 31, 2002, the Court conducted a hearing concerning Debtors' Motion at which the parties submitted evidence and testimony. In addition, the parties have executed and filed a stipulation containing certain agreed facts and copies of relevant documents. Docket No. 180. The parties also submitted briefs in support of their respective positions. Docket Nos. 179, 185, 186, and 187.

The Court took the issues raised by Debtors' Motion under advisement, and after due consideration of the evidence, testimony, and the parties' stipulation, intends this Memorandum to constitute its findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

## II. Procedural Matters

■ With one exception not relevant here, a request to obtain a determination by the Court concerning the validity, priority, or extent of a creditor's lien or other interest in a debtor's property must normally be made through commencement of an adversary proceeding under Part VII of the Rules. Fed. R. Bankr.P. 7001(2). Instead, Debtors have sought a determination of the creditors' interests in their asset by filing a motion. *See* Fed. R. Bankr.P. 9013 ("A request for an order ... shall be by written motion ...."). Debtors' Motion, and the creditors' opposition to the relief sought, initiated a contested matter, not an adversary proceeding. *See* Fed. R. Bankr.P. 9014 (explaining the procedure for resolving contested matters). While under these facts, Debtors' approach may be improper under the Rules, neither of the creditors whose rights are to be adjudicated in this matter have objected to Debtors' Motion on procedural grounds. In light of this, and because the Court concludes that, in this limited circumstance, the parties' procedural and substantive rights have not been prejudiced, the Court will not deny Debtors' Motion on procedural grounds, but will instead dispose of the issues raised therein on the merits.

■ In addition, Debtors' Motion raises another procedural question: Is it appropriate for the Court to determine the secured status of the creditors when the proposed settlement between Gietzen and Debtors has not been approved by this Court? Again, the Court concludes it can proceed to dispose of the Motion under these circumstances. While the proposed settlement apparently involves a payment of money from Gietzen to Debtors, the Court views Debtors' Motion as a request for a determination of the creditors' secured status in Debtors' as-of-yet unliquidated claim asserted against Gietzen in the state court suit. Such claim constitutes property of Debtors' bankruptcy estate. Since the issues regarding whether the creditors hold enforceable interests in the Debtors' claim against Gietzen are identical to those concerning the creditors' rights in any recovery on the claim, the Court concludes an actual controversy is

presented, and further concludes it can dispose of Debtors' Motion, even though no approved settlement yet exists.

## III. Facts

In addition to those recited above, the Court finds the following to be the facts.

In April, 1998, Debtors borrowed funds from UCB.[1] In connection with that loan, Debtors signed a security agreement in favor of UCB, in which Debtors granted UCB a security interest in Debtors' "Inventory . . . Accounts and Contract Rights . . . General Intangibles . . . Livestock . . . Milk Products Quota . . . [and] Monies, Deposits or Accounts in Possession." Ex. D, Docket No. 180. In addition, the security agreement provided that UCB's "interest in the collateral shall be a continuing lien and shall include all proceeds and products of the collateral including, but not limited to, the proceeds of any insurance thereon." Ex. D, Docket No. 180. UCB filed a UCC–1 financing statement to perfect its security interest. Ex. A, Docket No. 180. The balance due on the UCB loan is over $2.2 million. Docket No. 180.

In January, 2001, Debtors executed a promissory note in favor of O.H. Kruse in the amount of $550,000.00. This note represented amounts due from Debtors on their livestock feed account with O.H. Kruse. Docket No. 180. In addition to the note, the Debtors signed another document which provided:

We, JIM WIERSMA and PATTY WIERSMA . . . in order to secure the payment of that certain Promissory Note executed by us . . . hereby assign, transfer and convey to O.H. KRUSE . . . all our right, title and interest in and to any and all proceeds received by the undersigned from the lawsuit entitled *Jim Wiersma and Patty Wiersma v. Gietzen Electric* . . . .

Ex. I, Docket No. 180.

Gietzen's insurer has apparently offered Debtors $2.5 million to settle their claim against Gietzen. Debtors intend to accept this offer and, subject to Court approval, must pay their state court attorneys fees and costs. After doing so,[2] Debtors would expect to receive approximately $1.5 million from the settlement. Docket No. 180.

## IV. Discussion and Disposition of the Issues

### A. UCB's Secured Status

■ The parties do not dispute that UCB holds a valid, perfected secured interest.[3] Rather, the current dispute centers on the extent of the UCB security interest, and whether any settlement funds Debtors may receive as a result of their claims against Gietzen fall within the scope of the collateral in which UCB has an interest. Before resolving that dispute, a discussion of applicable law is necessary.

Security interests in Idaho are governed by the Uniform Commercial Code–Secured Transactions. Idaho Code § 28–9–101 *et seq.*[4] Revised Article 9 instructs that "ex-

1. According to the loan documents, Debtors actually borrowed the money from Sanwa Bank California. That entity is now apparently known as United California Bank, and so the Court will refer to the creditor by that name.

2. Of course, any payment to Debtors' state court counsel would be subject to approval by the Court, after appropriate application, no-

tice and a hearing. 11 U.S.C. §§ 327, 330; Fed. R. Bankr.P.2016(a).

3. Because no party challenged the UCB security interest at the hearing, in the pleadings or through briefing, the Court presumes, without deciding, for the purpose of this Motion, it is valid.

4. The Idaho Legislature adopted substantial revisions to Idaho Code Title 28, Chapter 9,

cept as otherwise provided in this part, this act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect." Idaho Code § 28–9–702. While UCB has asserted that Former Article 9 defines its rights,[5] the plain language of the statute requires that Revised Article 9 control the determination of secured status in the Debtors' claims against Gietzen.

There is also significant case law supporting an application of Revised Article 9 in this case. This Court recently addressed the applicability of Revised Article 9 to security interests created under Former Article 9. In *In re Hergert*, 275 B.R. 58 (Bankr.D.Idaho 2002), Judge Myers held that Revised Article 9 and its transition provisions controlled a dispute over a creditor's secured status in particular collateral. *Id.* at 62. The transactions giving rise to the security interests in *Hergert* occurred before the revisions to Article 9 took effect, but the debtors did not file for relief under the Bankruptcy Code until after Revised Article 9 took effect. *Id.*

Since all states have adopted major revisions to Article 9 of the UCC, several courts have analyzed which version of Article 9 to apply in a particular case. *Kelaidis v. Cmty. First Nat'l Bank (In re Kelaidis)*, 276 B.R. 266, 270 (10th Cir. BAP 2002) (applying Former Article 9 when all events generating the appeal occurred prior to revision); *In re Kellstrom Indus. Inc.*, 282 B.R. 787, 790 n. 3 (Bankr. D.Del.2002) (applying Revised Article 9 when bankruptcy filing occurred after revision); *Grabowski v. Deere & Co. (In re*

*Grabowski)*, 277 B.R. 388, 389–90 (Bankr. S.D.Ill.2002) (applying Revised Article 9 when bankruptcy filing occurred after revision); *Morris v. Gen. Motors Acceptance Corp. (In re Ball)*, 281 B.R. 706, 709–11 (Bankr.D.Kan.) (holding that the date a debtor files a bankruptcy petition determines whether Former or Revised Article 9 applies); *In re Payless Cashways, Inc.*, 273 B.R. 789, 791 (Bankr.W.D.Mo.2002) (applying Former Article 9 when bankruptcy filing occurred prior to revision, but emphasizing the fact that the transactions at issue occurred prior to revision); *Lustig v. Peachtree Settlement Funding (In re Chorney)*, 277 B.R. 477, 486 (Bankr. W.D.N.Y.2002) (applying Former Article 9 when bankruptcy filing occurred prior to revision). Because the approach taken by these courts has consistently been to apply Revised Article 9 when the debtor files for bankruptcy after the effective date of Revised Article 9, the Court is persuaded to invoke a similar rule here.

In this case, Debtors filed for bankruptcy on October 1, 2002, after Revised Article 9 took effect. Under the plain language of Idaho Code § 28–9–702 and the persuasive case authority cited above, Idaho's Revised Article 9 must control the Court's analysis of the issues here. Having so concluded, the Court now addresses UCB's arguments in turn.

## 1. Settlement proceeds as a general intangible.

■ UCB argues that the Debtors' claim against Gietzen, and any recovery on

---

which became effective July 1, 2001. The new statutes continue the application of the repealed law in some instances. Therefore, it is necessary to differentiate between the two bodies of law. For convenience, the Court will refer to those laws in effect before July 1, 2001, as "Former Article 9," and to those

now in effect as "Revised Article 9" or the "UCC." All citations in this decision refer to statutes currently in effect, unless otherwise noted.

**5.** Mem. of UCB at 5, Docket No. 179.

it, constitutes a general intangible and is, therefore, subject to the terms of UCB's security agreement. Under the Idaho UCC, a general intangible is defined as:

> [A]ny personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

Idaho Code § 28–9–102(42). Debtors argue their claim against Gietzen is a commercial tort, and is therefore excluded from the statutory definition of a general intangible. A "commercial tort" is defined by the UCC to be:

> [A] claim arising in tort with respect to which:
>
> (A) the claimant is an organization; or
>
> (B) the claimant is an individual and the claim:
>
> (i) arose in the course of the claimant's business or profession; and
>
> (ii) does not include damages arising out of personal injury to or the death of an individual.

Idaho Code § 28–9–102(13).

Because Debtors are individuals, and not an organization,[6] to be a commercial tort, and thus to be excluded from the UCC definition of a general intangible, Debtors' claim against Gietzen must both arise "in tort" and "in the course of [Debtors'] business or profession." The Court presumes

Debtors' claim against Gietzen arose in the course of Debtors' dairy business. However, determining whether Debtors' claim arose in tort is complicated in this case because of the various causes of action asserted by Debtors in their state court complaint against Gietzen. Ex. G–1, Docket No. 180. In that complaint, Debtors assert the right to recover a variety of damages from Gietzen under several different theories, including breach of contract, breach of warranty, negligence, fraud, and violation of Idaho's Consumer Protection Act. Notwithstanding the contents of the complaint, any payment made to Debtors by Gietzen's insurer would presumably constitute a compromise of any and all of Debtors' claims against Gietzen. Moreover, under these circumstances, the Court would expect an allocation of any settlement payment among Debtors' various theories of recovery to be practically, and legally, impossible.

Frequently, if the provisions of the UCC do not directly resolve a dispute, the Official Comments that accompany the statute provide general guidance to the courts. Unfortunately, the relevant Official Comments do not address the problem of how to classify a claim as arising in tort.

While there is no Idaho case law construing whether a claim arises in tort for purposes of Revised Article 9, another line of Idaho cases offers some guidance by analogy. Idaho Code § 12–120(3) provides:

> In any civil action to recover on an open account, account stated, note, bill, nego-

6. Under the UCC, "organization" includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, or any other legal or commercial entity. Idaho Code § 28–1–201(28). While the UCC does not define "individual," in dealing with a provision of Former Article 9, one court noted that the term "organization" did not apply to a husband and wife operating a retail store or to individual proprietorships. *Retreading Equip., Inc. v. Murphy (In re Murphy)*, 5 B.R. 596, 600 n. 1 (Bankr.N.D.Ga.1980). Debtors, who operate their dairy as a sole proprietorship, *do not fall within the definition of organization*. They do, however, seem to be individuals under the UCC.

tiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee. . . .

In interpreting this provision, the Idaho courts have drawn a distinction between claims that are based in contract, and therefore qualify for an award of fees as "commercial transactions", and those arising in tort, for which no fee award is allowed. For example, in *Powell v. Sellers*, 130 Idaho 122, 937 P.2d 434, 441 (Ct. App.1997), the Court of Appeals upheld the trial court's finding that a lawsuit between adjacent landowners was a commercial transaction under Idaho Code § 12–120(3). The court decided that, because the landowners had entered into a stipulated agreement, a subsequent suit alleging negligent performance under the agreement was a commercial transaction. *Powell*, 937 P.2d at 441. The court reasoned that the critical question in its determination was whether the contract was integral to the claims regarding a party's liability. *Id.* In answering that question, the court focused on the fact that the contract was the gravamen of the lawsuit. *Id.*

The court in *Powell* distinguished the facts of its case from those in *Brooks v. Gigray Ranches, Inc.*, 128 Idaho 72, 910 P.2d 744 (1996). In *Brooks*, a cattle owner sued a landowner for breach of an agistment contract and the landowner counterclaimed for conversion. *Brooks*, 910 P.2d at 746. The jury found against the cattle owner and in favor of the landowner on both claims. *Id.* With respect to attorney fees, the Idaho Supreme Court held that the landowner was not entitled to fees under Idaho Code § 12–120(3) because his claim was a tort. It also decided the fees were not apportionable between defending against the contract claim and pursuing the conversion claim. *Id.* at 751.

In reconciling these cases, the court in *Powell* held that the nexus between the stipulated agreement and negligence claim at issue in that case was closer than that between the agistment contract and conversion claim in *Brooks*. *Powell*, 937 P.2d at 441. This nexus evaluation is an example of the court's inquiry into whether a contract is both integral to the asserted claims and the gravamen of the lawsuit. *Id.*

Several other Idaho cases have dealt with the same issue to some extent.[7] *See*

---

**7.** In addition to Idaho, courts in California and Washington have issued decisions concerning similar issues. *See Abdallah v. United Savings Bank*, 43 Cal.App.4th 1101, 51 Cal. Rptr.2d 286, 293 (1996) (holding that attorney's fees did not need to be apportioned between causes of action for contract, fraud, and RICO violations because the various claims were inextricably intertwined); *Finalco v. Roosevelt*, 235 Cal.App.3d 1301, 3 Cal. Rptr.2d 865, 868–69 (1991) (holding that no apportionment of attorney's fees was necessary when party sought to recover on a promissory note and defended against an attack on the validity of the note under federal securities law); *Fed–Mart Corp. v. Price*, 111 Cal. App.3d 215, 168 Cal.Rptr. 525, 532 (1980) ("attorney fees need not be apportioned when

incurred for representation on an issue common to both a cause of action in which the fees are proper and one in which they are not allowed.") (citations omitted); *Wagner v. Benson*, 101 Cal.App.3d 27, 161 Cal.Rptr. 516, 522 (1980) (allowing attorney's fees for collection action and defense of fraud claim based on a contract providing for fees incurred in collection); *Hill v. Cox*, 110 Wash.App. 394, 41 P.3d 495, 505 (2002) ("Even still, if a tort action is based on a contract central to the dispute including an attorney fee provision, the prevailing party may receive attorney fees."); *Brown v. Johnson*, 109 Wash.App. 56, 34 P.3d 1233, 1234 (2001) ("If an action in tort is based on a contract containing an attorney fee provision, the prevailing party is

*Hayward v. Valley Vista Care Corp.*, 136 Idaho 342, 33 P.3d 816, 824 (2001) (holding a malpractice claim to be a tort despite the existence of an admission agreement between patient and nursing home); *Watts v. Krebs*, 131 Idaho 616, 962 P.2d 387, 395 (1998) (concluding that a claim for fraudulent inducement arises out of the contract at issue); *Farmers Nat. Bank v. Shirey*, 126 Idaho 63, 878 P.2d 762, 772 (1994) (holding an action was based in contract for purpose of awarding fees where party alleged existence of a contract and both contract and non-contract claims were litigated); *Freiberger v. American Triticale, Inc.*, 120 Idaho 239, 815 P.2d 437, 441 (1991) (holding a lawsuit to be based in contract despite the assertion of other non-contract claims). *See also Whitehead v. Van Leuven*, 347 F.Supp. 505, 508–09 (D.Idaho 1972) (explaining that a cause of action is best viewed as arising in contract, rather than in tort, when the claims appear to arise from the contract and not from some independent duty upon which a tort claim could be based).

While these decisions do not specifically address the character of a claim as a commercial tort claim under Revised Article 9, their analysis seems sound, and the circumstances of those cases appear reasonably analogous to the case at bar. Under the case law, if a party's claims against another are not premised primarily on tort causes of action, and where a contract between the parties exists, the claims need not be characterized as arising in tort. Because in this case a decision must be made without the benefit of a determination of the nature of any recovery by Debtors from Gietzen through litigation in state court, the Court will decide this issue by applying the reasoning of *Powell* and the related cases.

Here, the Court concludes the suit filed by Debtors against Gietzen is primarily premised on a contract between Debtors and Gietzen for the provision of electrical services.[8] However, more is required to determine whether Debtors' claim arises in contract than the mere existence of a contract. *See Brooks*, 128 Idaho 72, 910 P.2d 744, 751, (citing *Fuller v. Wolters*, 119 Idaho 415, 807 P.2d 633 (1991)). And, in this case, there is more.

First, Debtors' claims for breach of contract and breach of warranty relate directly to their contract with Gietzen. Clearly, the contract is integral to these claims. *Powell*, 937 P.2d at 441.

Debtors' other claims for negligence, fraud, and violations of Idaho's Consumer Protection Act, while not traditional contract claims, are also integrally related to the contract. The presence of these other causes of action in Debtors' complaint do not change the fundamental nature of the action and its genesis in contract law. The Debtors' contract with Gietzen and the resulting non-contract claims share the same sort of close nexus that existed in *Powell*, but was found lacking in *Brooks*. *Powell*, 937 P.2d at 441. Without the contract, Gietzen would not have performed any services at Debtors' dairy, negligently or otherwise.

Because the contract between Debtors and Gietzen is the gravamen of Debtors' claims, the Court concludes that those claims arise in contract rather than tort.

entitled to attorney fees. An action is 'on a contract' if a) the action arose out of the contract; and b) if the contract is central to the dispute.") (citing *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wash.App. 834, 942 P.2d 1072 (1997)).

8. At the hearing on this Motion, Debtors' attorney in the Gietzen lawsuit, who specializes in lawsuits of this nature, testified that Debtors are not disputing the existence of a contract despite the lack of any written agreement.

Therefore, Debtors' right to recover against Gietzen is not a commercial tort claim under the definition found in Idaho Code § 28–9–102(42). Completing the circle, the Court therefore concludes Debtors' claim against Gietzen fits the definition of a general intangible under the Idaho UCC, and is therefore subject to UCB's security agreement.

■ Even were this not the case, UCB has persuaded the Court that Debtors' claim against Gietzen should be subject to its security agreement for another reason. The Court concludes Debtors' claim against Gietzen constitutes a "thing in action," a kind of property expressly included in the general intangible definition.

While neither the UCC itself nor the Official Comments offer any insight into the definition of "thing in action," a lawsuit, and any recovery on it, is considered to be general intangible for Article 9 purposes. *See, e.g., First Am. Bank Valley v. George J. Hegstrom Co., Inc.*, 551 N.W.2d 288, 292 (N.D.1996) ("Courts uniformly hold that, under the UCC, proceeds of an anticipated recovery from an impending lawsuit constitute general intangibles."); *Meridian Bank v. Bell Fuel Corp (In re Bell Fuel Corp.)*, 99 B.R. 602, 606 (E.D.Pa. 1989) (noting that a lawsuit is a general intangible under the UCC), *aff'd*, 891 F.2d 281 (3rd Cir.1989); *In re Derecktor*, 150 B.R. 296, 298–99 (Bankr.D.R.I.1993) (finding a security agreement covering general intangibles to apply to a lawsuit and proceeds thereof). *Cf. Bonanza Motors, Inc. v. Webb*, 104 Idaho 234, 657 P.2d 1102, 1103–04 (Ct.App.1983) (equating a cause of action with a thing in action in determining whether a right was assignable). Since a lawsuit and any corresponding recovery is properly treated as a thing in action, Debtors' claim against Gietzen is a thing in action, and therefore a general intangible. Idaho Code § 28–9–102(42). Accordingly,

UCB's perfected security interest in Debtors' general intangibles applies to the Gietzen lawsuit.

## 2. Debtors' claim against Gietzen as proceeds of UCB's collateral

■ UCB also argues that Debtors' claim against Gietzen represents proceeds of encumbered cows and milk. Proceeds are defined as:

(A) whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

(C) rights arising out of collateral;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

Idaho Code § 28–9–102(64). A security interest attaches to any identifiable proceeds of collateral. Idaho Code § 28–9–315(a)(2). Further, a security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected. Idaho Code § 28–9–315(c).

Debtors' complaint requests unspecified amounts of damages for lost milk production, the cost of additional replacements to the herd, milk quality loss, diminished herd size, and for miscellaneous costs, future losses, and extra labor. Ex. G–1, Docket No. 180. According to a report prepared by Debtors' economic expert, absent any present value adjustment, these

damages likely exceed $5.82 million. Ex. G–2, Docket No. 180.

To some extent, UCB's argument that any settlement payment represents proceeds of collateral suffers from the same problems seen in characterizing Debtors' claims as arising in tort or contract. Debtors argue that some of the components of their damages do not represent proceeds of cows and milk serving as collateral and should not, therefore, be subject to UCB's security interest. For example, their complaint includes a reservation of a right to amend the complaint to request punitive damages. Because Gietzens' insurer is offering to settle all claims, including potential punitive damage claims which are not attributable to any particular item of UCB's collateral, Debtors contend the settlement represents some damages not directly related to the loss of collateral.

In this instance, though, the legislature has spoken. The UCC definition of "proceeds" includes within its scope *whatever* is acquired upon disposition of collateral, all *rights* arising out of collateral, and includes all *claims* arising out of the loss of, or damage to, collateral. Idaho Code § 28–9–102(64) (emphasis added). All of the categories listed in Debtors' damage analysis stem from either damage to Debtors' cows or from the loss of milk and cows. Ex. G–2, Docket No. 180. Even the "miscellaneous" and "labor" categories arise from damage to or loss of cows and milk because they represent expenses such as veterinarian bills and the Debtors' extra labor costs associated with dealing with the electrical problem affecting the cows. The same is true with respect to Debtors' claim for punitive damages. Thus, given these facts, the Court concludes Debtors' claims against Gietzen arose out of the loss of, and damage to, UCB's collateral, the cows and milk.

Under the language employed in Idaho Code § 28–9–102(64), any Gietzen settlement payment represents compensation to Debtors for the loss of and damage to UCB's collateral and must be considered proceeds. In *Fifteenth RMA Partners, L.P. v. Pacific/West Communications Group, Inc.* (*In re Pacific/West Communications Group, Inc.*), 301 F.3d 1150, 1151–52 (9th Cir.2002), the court held that provisions of California's UCC, which are substantially similar to those in Idaho, allowed a security interest to continue in lawsuit settlement funds as proceeds of collateral. *See also McGonigle v. Combs,* 968 F.2d 810, 828 (9th Cir.1992) (defining a recovery on a lawsuit to be proceeds under Article 9); *Figueroa v. Acropolis,* 192 Ariz. 563, 968 P.2d 1048, 1050 (Ct.App.1997) (holding settlement funds to be proceeds under Article 9). Thus, UCB's security interest attaches to the Gietzen lawsuit as proceeds, pursuant to Idaho Code § 28–9–315(a)(2).

UCB's interest in the Gietzen lawsuit, as proceeds of collateral, is also a perfected interest. Idaho Code § 28–9–315(c) provides that a security interest in proceeds is perfected if the security interest in the original collateral was perfected. The Official Comment to this section reiterates this rule and elaborates on it by noting that a continuing security interest in proceeds of collateral only remains perfected if a filed financing statement covered the original collateral, the proceeds are collateral in which a security interest may be perfected by filing in the office where the financing statement has been filed, and the proceeds have not been acquired with cash proceeds. Idaho Code § 28–9–315(d)(1); Official Comment at 4. In applying the Former Article 9 provision that corresponds to Idaho Code § 28–9–315, a court held that a secured party's interest in proceeds remained perfected because the se-

cured party perfected its interest in the original collateral by filing in the same place necessary to perfect an interest in the proceeds. *Cassel v. Kolb*, 72 Cal. App.4th 568, 84 Cal.Rptr.2d 878, 883–84 (1999). *See also In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 94 (Bankr.N.D.Ill.1991); *In re Star Safety Inc.*, 39 B.R. 755, 756–57 (Bankr.D.N.D.1984).

UCB perfected its security interest in the original collateral by filing a financing statement with the Idaho Secretary of State. Because that is the same place where a creditor would file to perfect an interest in the proceeds (*i.e.*, the Gietzen lawsuit in this instance), and because there is no issue regarding the proceeds being acquired with cash proceeds, UCB is a perfected secured creditor in the proceeds of the original collateral. Idaho Code § 28–9–315(c), (d).

### B. O.H. Kruse's Secured Status

 Although not addressed by the parties, an issue exists as to whether O.H. Kruse was granted a security interest in Debtors' claim against Gietzen or instead received an absolute assignment of Debtors' interest in the claim. An absolute assignment effects a transfer of all an owner's interest in property. *Haag v. Pollack*, 122 Idaho 605, 836 P.2d 551, 556 (1992). In contrast, a security interest is an interest in personal property or fixtures which secures payment or performance of an obligation. Idaho Code § 28–1–201. While distinguishing between the two types of transactions is sometimes difficult, courts often look past the express language of the documents evidencing a transaction and treat purported assignments as security agreements to give effect to the true nature of a transaction. *See Sarf v. Leff* (*In re Candy Lane Corp*), 38 B.R. 571, 575–76 (Bankr.S.D.N.Y.1984). Courts differentiate between the two

transactions by examining the substance of the documents in the context of the surrounding transaction. *Id.* at 576.

 Debtors signed a document entitled "Assignment," which may suggest the document was intended to effect an absolute conveyance of the Gietzen claim from Debtors to O.H. Kruse. Regardless of the form of this instrument, the substance of the relevant documents indicates that both Debtors and O.H. Kruse intended to create a security interest rather than an assignment. Both the promissory note and the assignment document use language designed to give O.H. Kruse rights in Debtors' claims against Gietzen to secure payment of a debt. Ex. H and I, Docket No. 180. Notably absent is any indication that Debtors intended to give up all their interest in the Gietzen lawsuit to O.H. Kruse. *Haag*, 836 P.2d at 556.

As for the context of the transaction, the fact that Debtors' argue that O.H. Kruse does not meet the technical requirements of a security interest and make no mention of the effect of O.H. Kruse having an assignment suggests that Debtors intended to use the Gietzen lawsuit as collateral for their debt with O.H. Kruse. The fact that O.H. Kruse filed a financing statement suggests that, like Debtors, O.H. Kruse intended for the transaction to create a security interest. In addition, O.H. Kruse apparently gave Debtors no credit on the balance due on the note in consideration of the assignment, something which could be expected were an absolute transfer intended. In light of these facts, the Court holds that Debtors and O.H. Kruse intended to create a security interest, not effectuate an absolute assignment.

 O.H. Kruse's secured status is a function of its compliance with Idaho Code § 28–9–101 *et. seq.* Debtors argue that O.H. Kruse does not have an enforceable security interest in any Gietzen recovery

because the parties never executed a security agreement. Because the validity of O.H. Kruse's security interest is challenged, a further discussion of Revised Article 9 is necessary.

To address security interests created under Former Article 9, Revised Article 9 provides:

A security interest that is enforceable [before Revised Article 9] takes effect and would have priority over the rights of a person that becomes a lien creditor at that time is a perfected security interest under [Revised Article 9] if, when [Revised Article 9] takes effect, the applicable requirements for enforceability and perfection under [Revised Article 9] are satisfied without further action.

Idaho Code § 28–9–703(a). Since the transaction between O.H. Kruse and Debtors occurred before Revised Article 9 took effect, O.H. Kruse's security interest is enforceable if it was perfected under Former Article 9 and required no further action in order to comply with Revised Article 9.

Under Former Article 9:

A security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) ... the debtor has signed a security agreement which contains a description of the collateral ...

(b) value has been given; and

(c) the debtor has rights in the collateral.

Idaho Code § 28–9–203(1) (1995). Further, a financing statement must be filed to perfect all security interests, subject to exceptions not relevant to this case. Idaho Code § 28–9–302(1) (1995).

 With respect to the sufficiency of a security agreement, the Idaho Supreme Court has explained the require-

ments. *Simplot v. Owens,* 119 Idaho 243, 805 P.2d 449 (1990). In *Owens,* the plaintiff contended his ownership of a bus was free from a security interest purportedly created in favor of the defendant in two promissory notes containing the words "SECURITY: 1956 GMC bus" and through delivery of the certificate of title to the defendant. *Id.* at 450. The court held that the combination of delivery of the certificate of title and inclusion of the language in the promissory note was sufficient to create a security interest under Former Article 9. *Id.* at 452. In addition, the court observed that no special words are necessary to create a security interest. *Id.* at 451–52 (internal citations omitted). Furthermore, the court noted it was the policy of Idaho's UCC that form not prevail over substance and that, whenever possible, effect should be given to the parties' intent. *Id.* Given this instruction, the touchstone question in determining if a security interest was created is whether the transaction was intended by the parties to have the effect of giving security. *Id.* at 451 (quoting *Matter of Miller,* 545 F.2d 916 (5th Cir.1977)).

There can be little doubt that the transaction between Debtors and O.H. Kruse created a valid security interest. Debtors executed a promissory note in favor of O.H. Kruse that indicated it was "secured" by an assignment of proceeds from the Gietzen lawsuit. Ex. H, Docket No. 180. Shortly thereafter, Debtors executed the assignment intending to "secure the payment of" the promissory note. Ex. I, Docket No. 180. This combination of facts shows both a debt existed and the granting of a security interest to secure payment of that debt. *Owens,* 805 P.2d at 452. The Court finds that Debtors intended to grant O.H. Kruse a security interest in any Gietzen lawsuit proceeds in order to secure payment of the promissory note. The

Court also finds that these documents created a valid security agreement, which contained an adequate description of the collateral, and was signed by the Debtors.

The other two requirements to establish an enforceable security interest under Former Article 9 have also been satisfied. O.H. Kruse gave value to Debtors by providing feed for Debtors' dairy. And Debtors, as the plaintiffs in the Gietzen lawsuit, had rights in the collateral. O.H. Kruse also perfected its security interest by recording a financing statement. Ex. J, Docket No. 180.

Because O.H. Kruse had a valid, perfected security interest under Former Article 9, the continued validity of that interest depends on whether it meets the requirements under Revised Article 9 without further action. It does. Under Revised Article 9:

[A] security interest is enforceable against the debtor and third parties with respect to the collateral only if:

(1) Value has been given;

(2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(3) One (1) of the following conditions is met:

(A) the debtor has authenticated a security agreement that provides a description of the collateral ...

Idaho Code § 28–9–203(b). As for perfecting a security interest, Idaho Code § 28–9–310, provides that "except as otherwise provided ... a financing statement must be filed to perfect all security interests and agricultural liens." As mentioned above, O.H. Kruse gave value and Debtors had rights in the collateral. Additionally, since the definition of "security agreement" is nearly identical under both Former and Revised Article 9,[9] the reasoning of *Owens* is still applicable here as to the sufficiency of the documents as a security agreement.

The above analysis of Debtors' transaction with O.H. Kruse under both Former and Revised Article 9 yields the conclusion that O.H. Kruse had an enforceable, perfected security interest under Former Article 9 that remained so under Revised Article 9. Idaho Code § 28–9–703(a).[10]

### C. Debtors' Status

■ In addition to arguing that neither UCB nor O.H. Kruse has an enforceable security interest in the Gietzen lawsuit, Debtors alternatively argue that this Court should, through use of its inherent equitable powers, order an appropriate allocation of any lawsuit recovery among Debtors and the creditors. While this argument is creative, Debtors have made no factual showing to justify such a result. Such an order would also run afoul of the dictates of the Idaho State Legislature, as expressed in Revised Article 9, and of Congress, as expressed in the Bankruptcy Code. These legislative bodies have made the relevant policy decisions regarding

---

9. *Compare* Idaho Code § 28–9–105(1)(*l*) (1995) ("an agreement which creates or provides for a security interest"), *with* Idaho Code § 28–9–102(a)(73) ("an agreement that creates or provides for a security interest").

10. Since UCB perfected its security interest in any Gietzen recovery by filing its financing statement first, O.H. Kruse's security interest in the Gietzen lawsuit is second in priority to UCB's security interest. *See* Idaho Code

§ 28–9–709(a) (providing that when the relative priorities of conflicting claims were established before Revised Article 9 took effect, Former Article 9 controls priority); Idaho Code § 28–9–312(5)(a) (1995) (providing that conflicting security interests rank according to priority in time of filing or perfection). However, the Court has not been asked to determine the relative priorities of the creditors' interests, and so does not do so here.

how Debtors' and the creditors' property interests must be treated in a bankruptcy case. This Court is not free to disregard these laws. Since Debtors offer no factual or legal basis for their proposal for an equitable allocation, it must be rejected.[11]

## V. Conclusion

The Court concludes that UCB has a valid, perfected security interest in Debtors' claims asserted in the Gietzen lawsuit, and in any recovery on those claims. For purposes of Revised Article 9, Debtors' claims against Gietzen arise in contract, and as such, they represent a general intangible subject to UCB's perfected security interest. UCB also has a security interest in any lawsuit as proceeds of cows and milk, which were UCB's collateral.

The Court further concludes that O.H. Kruse has a valid, perfected security interest in the Gietzen lawsuit and any recovery thereon. Under applicable state law, Debtors' execution of the note and assignment was sufficient to create a security interest in favor of O.H. Kruse, which was what the parties intended. Accordingly, O.H. Kruse had an enforceable security interest under Former Article 9 that remains enforceable under Revised Article 9.

A separate order will be entered.

---

11. The Court expresses no opinion concerning whether Debtors may have statutory rights to access some of the settlement monies in consideration of their efforts, if those monies are in fact realized. *See, e.g.,* 11 U.S.C. § 506(c) (authorizing a debtor in possession to recover reasonable, necessary costs and expenses of preserving, or disposing of property securing a creditor's claim to the extent of any benefit to creditor); *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000); *In re Los Gatos Lodge, Inc.,* 278 F.3d 890 (9th Cir.2002); *In re Borba,* 98.2 I.B.C.R. 44 (Bankr.D.Idaho 1998). *See also* 11 U.S.C. § 552(b) (providing that a prebankruptcy security interest may attach to proceeds of collateral acquired by the bankruptcy estate "except to any extent that the court, after notice and a hearing and based on the equities of the case, order otherwise".); *Fin. Sec. Assurance, Inc. v. Days California Ltd. P'ship (In re Days California Ltd. P'ship),* 27 F.3d 374 (9th Cir. 1994); *In re Ledis,* 259 B.R. 472 (Bankr. D.Mass.2001); *Marine Midland Bank v. Breeden (In re Bennett Funding Group, Inc.),* 255 B.R. 616 (E.D.N.Y.2000); 5 Collier on Bankruptcy ¶ 552.02[4] (15th Ed. Revised 2000).