In re Jim Lee **WIERSMA** and Patricia Darlene Wiersma, Debtors.

Jim Lee Wiersma; Patricia Darlene Wiersma, Appellants and Cross–Appellees,

v.

O.H. Kruse Grain and Milling, nka Ferndale Grain, Appellee and Cross–Appellant,

v.

United California Bank, nka Bank of the West, Appellee.

Jim Lee Wiersma; Patricia Darlene Wiersma, Appellants,

v.

United States Trustee; O.H. Kruse Grain and Milling, nka Ferndale Grain; United California Bank, nka Bank of the West, Appellees.

O.H. Kruse Grain and Milling, nka Ferndale Grain, Appellant,

v.

Jim Lee Wiersma; Patricia Darlene Wiersma; United California Bank, nka Bank of the West; United States Trustee, Appellees.

BAP Nos. ID–02–1523–MAPB, ID–02–1541–MAPB, ID–03–1215–MAPB, ID–03–1224–MAPB.
Bankruptcy No. 01–41874.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted July 30, 2004.

Filed Feb. 1, 2005.

Brent T. Robinson, Ling, Nielsen & Robinson, Rupert, ID, for Jim and Patricia Wiersma.

William R. Hollifield, Hollifield & Bevan, P.A., Twin Falls, ID, for O.H. Kruse Grain and Milling nka Ferndale Grain.

Kelly Greene McConnell, Givens Pursley LLP, Boise, ID, for United California Bank nka Bank of the West.

Before: MARLAR, PERRIS and BRANDT, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

### INTRODUCTION

Idaho dairy farmers Jim and Patricia Wiersma ("Debtors") filed a chapter 11[1] petition and proposed a plan to relocate their failed dairy business to Georgia. Debtors' cows had been subjected to electrical shocks from faulty wiring and had been culled until the herd was completely liquidated. Debtors sued the electrical contractor and, upon settlement of the state court lawsuit for $2.5 million cash ("Settlement Proceeds"), Debtors proposed to use the Settlement Proceeds to purchase cows and begin anew in Georgia. They proposed to give their major secured creditor, United California Bank, nka Bank of the West ("Bank"), a replacement lien in the new cows, but Bank objected. The bankruptcy court had already determined that Bank and another creditor, O.H. Kruse Grain and Milling, nka Ferndale Grain ("Ferndale") had secured interests in the Settlement Proceeds.

At plan confirmation, the bankruptcy court held that new cows were not the "indubitable equivalent" of cash, and further found that Debtors' plan was not feasible. It denied confirmation and, after giving Debtors the chance to file a Third Amended Plan, dismissed the bankruptcy case.

These appeals and cross-appeals concern three orders: (1) a September 24, 2002, order determining the secured interests of the Bank and Ferndale in the Settlement Proceeds ("Order Re Secured Status") (BAP Nos. 02–1523 and 02–1541); (2) a February 11, 2003, order denying confirmation of Debtors' Second Amended Plan and approving Debtors' motion to settle;[2]

---

1. Unless otherwise indicated, "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330; rule references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), Rules 1001–9036, which incorporate certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

2. Debtors did not appeal the February 11, 2003 order. An order denying confirmation of a chapter 11 plan is interlocutory. *See Lievsay v. W. Fin. Sav. Bank (In re Lievsay),* 118 F.3d 661, 662 (9th Cir.1997) (citing *Nicholes v. Johnny Appleseed (In re Nicholes),* 184 B.R. 82, 86 (9th Cir. BAP 1995)). It merged into the final order dismissing the case. *See Munoz v. S.B.A.,* 644 F.2d 1361, 1364 (9th Cir.1981). In contrast, the portion of the order which approved the settlement may have been a final order. We do not reach the finality question because we dismiss the appeal of the settlement order as moot. *See* Discussion below.

and (3) an April 4, 2003, dismissal order (BAP Nos. 03–1215 and 03–1224).

In these appeals, we construe Idaho's revised Article 9 of the Uniform Commercial Code ("UCC"),[3] and decide whether a cash settlement of a lawsuit for damage to collateral constitutes either proceeds of Bank's livestock collateral or an after-acquired "payment intangible" collateral.

We AFFIRM the bankruptcy court's orders with two exceptions. Ferndale's appeal of the Order Re Secured Status granting its secured interest in the Settlement Proceeds and the appeal of the order approving the settlement are both DISMISSED as moot.

## FACTS[4]

Debtors owned and operated an Idaho dairy consisting of two facilities with 2,000 cows. They filed a chapter 11 petition on October 1, 2001.

Debtors' financial problems stemmed from faulty electrical work performed in an expansion of their dairy by Geitzen Electric, Inc. ("Geitzen"). As a result, Debtors' dairy cows were subjected to varying degrees of electrical shocks which caused the cows to produce less milk, become sick or die. The entire herd was eventually lost.

Debtors initiated a lawsuit against Geitzen ("Geitzen Lawsuit") in which they sought $6 million in damages. The Geitzen Lawsuit was brought under both tort and breach of contract theories.

Bank was Debtors' largest secured creditor. Following liquidation of the cows, its claim was approximately $2.2 million. Bank held a valid and perfected security interest[5] in Debtors' dairy herd and, among other things, in all of Debtors' "Inventory ... Accounts and Contract Rights ... General Intangibles ... Livestock ... Milk Products Quota ... [and] Monies, Deposits or Accounts in Possession." Agricultural Credit Agreement, p. 4, Section III, Exh. D to Stipulation of Facts (July 30, 2002). In addition, Bank had a security interest in after-acquired property, and in "all proceeds and products of the collateral including, but not limited to, the proceeds of any insurance thereon." *Id.*

Debtors also owed about $550,000 to Ferndale for livestock feed. This debt was evidenced by a promissory note and an assignment for security ("Assignment") of Debtors' right, title, and interest in any proceeds from the Geitzen Lawsuit. Ferndale perfected its security interest by filing a UCC–1 Financing Statement as to "[a]ny and all proceeds received by Debtors from the lawsuit ....". Financial Statement, exh. J to Stipulation of Facts (July 30, 2002).

Additionally, Debtors owed approximately $125,000 in priority taxes and $1.2 million in unsecured claims. Debtors'

---

**3.** The bankruptcy court determined that revised Article 9 of the UCC applied because the bankruptcy petition was filed after the revision took effect on July 1, 2001. This ruling has not been challenged on appeal. Revised UCC Article 9, and the official comments thereto, were enacted by the Idaho legislature. *See* Idaho Code, Secured Transactions, §§ 28–9–101 to 28–9–709. It provides that "this act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect." Idaho Code § 28–9–702(a).

**4.** The undisputed underlying facts were presented in the parties' Stipulation of Facts and the bankruptcy court's decisions.

**5.** No one challenged the validity of Bank's secured claim, and the bankruptcy court presumed it was valid and perfected. *See In re Wiersma*, 283 B.R. 294, 298 n. 3 (Bankr.D.Idaho 2002).

dairies were eventually foreclosed and their dairy operation was terminated.

In 2002, Debtors and their Special Counsel reached a settlement with Geitzen and its insurer to pay Debtors $2.5 million. The estate stood to receive approximately $1.6 million of the Settlement Proceeds upon bankruptcy court approval of the settlement. However, Bank claimed the entire estate's interest as its cash collateral, and Ferndale also claimed against the Settlement Proceeds pursuant to its security agreement and Assignment.

### Motion to Determine Secured Interests

Debtors then filed a § 506(a) Motion to Determine Secured Status. Debtors' position was that neither Bank nor Ferndale had a secured interest in the Settlement Proceeds because the Geitzen Lawsuit sounded in tort, and UCC Article 9 excluded tort claims from the "general intangibles" category.

Bank argued that the Settlement Proceeds were either "general intangibles" or livestock proceeds. Ferndale claimed priority over Bank and maintained that it, alone, was entitled to the Settlement Proceeds.

Following a hearing, the bankruptcy court rendered a published opinion on the matter. *In re Wiersma,* 283 B.R. 294 (Bankr.D.Idaho 2002). First, the bankruptcy court classified the Geitzen Lawsuit as a contract action and, therefore, held that Article 9 applied to give Bank a secured interest in the Settlement Proceeds as either "general intangibles" or "accounts." Alternatively, the bankruptcy court held that the Settlement Proceeds constituted proceeds of Bank's livestock collateral.

Next, the bankruptcy court examined Debtors' transaction with Ferndale. It concluded that the note and Assignment constituted a written security agreement which gave Ferndale rights in the Settlement Proceeds.

The Order Re Secured Status was entered on September 24, 2002. Debtors timely appealed (ID–02–1523), and Ferndale timely cross-appealed (ID–02–1541). They both challenged Bank's secured interest in the Settlement Proceeds, and Debtors also disputed Ferndale's secured interest, under the same tort theory.

### Plan of Reorganization and Motion to Settle

While the Geitzen Lawsuit was still pending, Debtors filed their first plan of reorganization and disclosure statement, and shortly thereafter, their motion to settle.

Although Debtors stated, in their motion, that they believed their damages were at least $6 million, they agreed to accept a "total value" of $2.5 million from Geitzen, to be used for "the purchase of dairy cows for Debtors' benefit, to be utilized by Debtors in reorganizing their dairy operation." Motion for Order Approving Settlement (June 26, 2002), at 3. Debtors planned to use the funds to purchase about 800 cows, in Georgia, which they valued at $1.4 million.

Bank and Ferndale filed conditional objections to the settlement. They did not oppose the $2.5 million amount, but objected to use of the money to purchase new dairy cows.

Debtors filed a Second Amended Disclosure Statement and First Amended Plan, in which they discussed their "cows-for-cows" plan.[6] Bank objected.

---

6. Debtors' Second Amended Disclosure Statement stated, in pertinent part:

Debtors have reached an agreement with Geitzen Electric (its insurance company),

In considering the motion to settle, the court noted unanimous agreement on the amount of settlement but dispute over the secured interests, as well as the cash and non-cash components. Special Counsel for Debtors informed the court that she had negotiated an all-cash settlement, whereas Debtors' attorney countered that the settlement was instead to be the purchase of a replacement herd. However, because the actual settlement agreement had not been executed or filed, the bankruptcy court continued the hearing.

Shortly thereafter, Special Counsel filed (1) a Motion for Order Approving Settlement; (2) an itemization of the proposed disbursements of the Settlement Proceeds, showing that, after paying attorney's fees and costs totaling about $801,609.21,[7] Debtors would receive a net settlement of about $1.6 million; and (3) a "Release and Indemnity Agreement" ("Settlement Agreement"), which had been signed by Debtors and Geitzen in December, 2002.

The Settlement Agreement stated that Debtors would release their claims against Geitzen in exchange for the "payment of the total sum of ($2,500,000.00), Two Million Five Hundred Thousand DOLLARS to be paid by Continental Western Insurance Company and Geitzen Electric, Inc. . . . ." Settlement Agreement (Dec. 20, 2002), at 1. Thus, Debtors apparently conceded that they would settle for cash. Still, Debtors clung, in their Second Amended Plan, to their desire to use the cash to purchase cows.

The Second Amended Plan had been filed on November 22, 2002, a month before the Settlement Agreement was executed. It proposed that Debtors would purchase new cows in Georgia, where Debtors would move and operate a new dairy, which new facility they would lease for $10,000 per month. They proposed to fund the plan from the sale of milk product in Florida, where they determined they could get the best price. The allowed secured claims of both Bank and Ferndale were to be secured by liens in the new cows and in the milk and milk proceeds of the new dairy.[8] Bank's secured claim was estimated to be the value of Debtors' interest in the Settlement Proceeds—$1.6 million, and Debtors proposed to pay that amount in monthly payments of between $16,000 and $23,000, with a balloon payment at the end of seven years.

Bank's unsecured claim, as well as other unsecured claims, would be paid from the Settlement Proceeds, on a *pro rata* basis, a total sum of $600,000, or about $7,000 per month.

Debtors also proposed to pay over $125,000 in taxes which they owed in monthly payments over five years, at a rate of about $2,500 per month. They also proposed to make payments to various other creditors almost $5,000 per month. The sum of Debtors' payments proposed under

which provides that Geitzen Electric (its insurance company) shall purchase cows for *and on behalf of the debtors. It is the debtors* [sic] intent to propose a plan whereby the cows will be purchased in Florida, or a state near Florida, where the debtors will operate a dairy. The milk will be sold on the Florida market and the funds that are derived from the dairy operation shall be used to fund the debtors' plan.
Second Amended Disclosure Statement (July 29, 2002), at 23.

7. Special Counsel agreed to reduce its fees from 40%, or $961,831.05, to 33–1/3%, or *$801,609.21.* The additional *$160,321.84* would be available to Debtors to use in their plan.

8. This provision was not in the Second Amended Plan, but was made with an oral amendment at the hearing.

the Second Amended Plan exceeded well over $40,000 per month.

Bank objected to these amended plans contending, *inter alia,* that they were neither fair and equitable nor feasible.

### Bankruptcy Court Denies Plan, Approves Settlement

Plan confirmation hearings and the continued hearing on the motion to settle were conducted over three days.

The court first addressed the continued motion to settle, noting the unusual situation where Debtors demanded a settlement for cows, while their Special Counsel and the Settlement Agreement, which was signed by Debtors, clearly stated that the settlement was for $2.5 million cash.[9] The court, finding the terms of the Settlement Agreement to be fair and reasonable, approved it.[10]

As for the Second Amended Plan, the court focused on two of Bank's objections: failure to provide it with the "indubitable equivalent" of value for its claim, and lack of feasibility. The court ruled against Debtors on both issues, explaining that Bank would be exposed to much greater risk under the plan's provision to purchase cows, rather than by segregating and paying Bank's cash collateral to it. While the court said that feasibility was a "close call," due to Debtors' evidence of projected

market for milk product in Florida, it nonetheless found that such a "startup" enterprise, in a new part of the country, could not withstand any period of underachievement without an influx of capital or lower debt service. Mem. Dec. (Feb. 11, 2003), at 48, 54. The bankruptcy court concluded that the Second Amended Plan was not feasible. Rather than dismiss the case, the court gave Debtors 21 days to file an amended plan and/or negotiate a consensual plan with Bank.

### Third Amended Plan and Dismissal

Not prone to giving up, Debtors then filed a timely Third Amended Plan. They proposed to reduce the Bank's estimated $1.4 million secured claim (based on the valuation of the new cows) by: (1) a possible surcharge of about $178,000;[11] (2) a cash payment from a home equity loan of $50,000; and (3) a cash payment (from reduction of Special Counsel's fees) of $160,000. They would pay Bank the balance of $1,055,955.64 at 7% interest (increased from 6%) in 84 monthly payments, with a balloon payment at the end of three years instead of seven years. Moreover, the approximate highest anticipated monthly payment to Bank would be reduced to $18,000 instead of $23,000. Finally, Debtors proposed to give Bank a lien in the new cows and "all livestock replace-

9. Debtors explained that they wanted to avoid negative tax consequences and therefore demanded that approval be given only for the purchase of cows. The court was not convinced by Debtors or their tax attorney of the reality of such tax consequences, or that they could not be offset by losses. Order Re Confirmation (Feb. 12, 2003), at 35–36. Later, in the dismissal proceedings, Debtors' attorney testified that there was new evidence of a $281,000 tax liability if the Settlement Proceeds went to Bank instead of invested in cows. Tr. of Proceedings (March 20, 2003), at 17.

10. Debtors then moved for reconsideration of the order approving the Settlement Agreement. The reconsideration motion was denied in a separate order. Debtors did not appeal either order at that time. We do not need to address any timeliness problem, however, based on the dismissal of the appeal of this order on mootness grounds. *See* Discussion below.

11. Debtors had since filed a § 506(c) motion to surcharge and a § 552(b) motion to reduce Bank's secured claim for equitable reasons.

ments," as well as in milk and milk proceeds.

Debtors also obtained a $60,000 loan to be used as startup capital, and reduced their debt service to other creditors by about $2,600. They revised their budget to indicate an increased cash flow, and presented a letter from one of their employees, who had experience in the South, stating that he would assist Debtors.

At the next confirmation hearing, Bank maintained its objection to the proposed plan. Bank argued that the new, approximate $200,000 cash "equity cushion" was insufficient protection for an estimated $1.4 million secured debt, and that Debtors had no cash reserves.

The bankruptcy court, in an oral ruling, concluded that, even with the changes proposed by Debtors, its original concerns as to the "indubitable equivalent" and feasibility had not been rectified in the Third Amended Plan, nor could Debtors reach a consensus with Bank. It estimated, without ruling (because the motions were not before it), that Debtors' pending motion to surcharge would not warrant a reduction in Bank's secured claim of more than a few thousand dollars, instead of the $178,000 contemplated by Debtors. Nor did the court expect that it would find equitable reasons to reduce Bank's claim under the pending § 552(b) motion. The bankruptcy court thus concluded that Debtors could not propose a confirmable plan, and granted the United States Trustee's motion to dismiss the case.

Debtors timely appealed the order of dismissal, which included therein the 2002 Order Re Secured Status, and the order which denied confirmation of the Second Amended Plan and approved the settlement. Ferndale then filed a notice of appeal as to the Order Re Secured Status, which, it assumed, had merged into the final dismissal order.

### ISSUES

1. Whether the panel has subject matter jurisdiction over the appeal of the Order Re Secured Status.

2. Whether the bankruptcy court erred in determining that Bank and Ferndale had valid and perfected security interests in the Settlement Proceeds.

3. Whether Debtors' appeal of the settlement approval order is moot.

4. Whether the bankruptcy court erred in denying plan confirmation based on Debtors' failure to provide Bank with the "indubitable equivalent" of the value of its claim and lack of feasibility.

5. Whether the bankruptcy court abused its discretion in dismissing Debtors' case based on their inability to propose a confirmable plan, without conducting an evidentiary hearing on their Third Amended Plan.

### STANDARD OF REVIEW

 We review factual findings of the bankruptcy court for clear error and its conclusions of law de novo. *See Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir.1996). Factual findings of the bankruptcy court should only be disturbed if a review of the record leaves a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Mixed questions of law and fact are reviewed de novo. *See Wattson Pac. Ventures v. Valley Fed. Sav. & Loan (In re Safeguard Self–Storage Trust)*, 2 F.3d 967, 970 (9th Cir.1993).

 Whether a reorganization plan is feasible is a question of fact, while the

determination of whether a plan provides a secured creditor with the "indubitable equivalent" of its claim is a mixed question of law and fact. *See Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.),* 80 B.R. 171, 172 (9th Cir. BAP 1987).

■ The order denying confirmation of the plan and dismissing the case for cause, under § 1112(b), is reviewed for an abuse of discretion. *See id.; Pioneer Liquidating Corp. v. United States Trustee (In re Consolidated Pioneer Mortgage Entities, Inc.),* 264 F.3d 803, 808 (9th Cir.2001)(converting case for cause under § 1112(b)).

## DISCUSSION

### I. BAP Jurisdiction: Order Re Secured Status

(BAP Nos. 02–1523, 02–1541, 03–1215 & 03–1224)

Both Bank and the United States Trustee contend that the panel lacks subject matter jurisdiction over Debtors' and Ferndale's appeals of the Order Re Secured Status.

In 2002, Debtors and Ferndale filed timely notices of appeal of the Order Re Secured Status. The panel mistakenly believed the orders were interlocutory, and when the appellants failed to respond to a notice of jurisdictional deficiency, it dismissed both appeals for lack of prosecution.

In 2003, after the bankruptcy case was dismissed, Debtors and Ferndale renewed their appeals of the Order Re Secured Status, and Bank moved to dismiss those appeals as untimely. *See* Fed. R. Bankr.P. 8002(a) (a notice of appeal must be filed within ten days after entry of the order appealed).

■ A BAP motions panel then determined that the Order Re Secured Status was not interlocutory, after all, but had always been a final order, a conclusion with which we agree.[12] The motions panel then vacated the previous dismissal orders and reinstated the original appeals, reasoning that it had misled the appellants.

Appellees now question the panel's jurisdiction, both in reinstating the previously dismissed appeals and in considering the 2003 appeals.

■ We have inherent authority to rectify an inadvertent misapprehension of the actual facts and correct an order to reflect the court's intentions. *See Cisneros v. United States (In re Cisneros),* 994 F.2d 1462, 1466 (9th Cir.1993) (affirming bankruptcy court in *sua sponte* vacating mistaken discharge order); *Ford v. Ford (In re Ford),* 159 B.R. 590, 593 (Bankr. D.Or.1993) (reading *Cisneros* "as a reaffirmation of a court's inherent power to correct its own clerical errors"). *Compare* Federal Rule of Civil Procedure 60(a) ("Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative . . . ."). Fed. R. Bankr.P. 9024/Fed. R. Civ. P. 60(a). We also have inherent power to "rescind, reconsider, or modify an interlocutory order." *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper,* 254 F.3d 882, 886–87 (9th Cir.2001); 11 U.S.C. § 105(a).

■ We believe that the 2002 appeals were mistakenly dismissed for lack of prosecution when our orders were intended, although, incorrectly so, to dismiss the appeals as interlocutory.

---

**12.** We are not bound by the actions of the motions panel. *See Bentley v. Bank of Coronado (In re Crystal Sands Props.),* 84 B.R. 665, 666 (9th Cir. BAP 1988) (citing *Brady v. Andrew (In re Commercial W. Fin. Corp.),* 761 F.2d 1329, 1332 n. 6 (9th Cir.1985)).

In retrospect, the order which requested briefing on the finality issue was misleading and stated, in pertinent part:

The routine jurisdictional screening conducted by the BAP suggests that there may be an issue concerning the finality of the order on appeal. . . .

If further proceedings will affect the scope of the order on appeal, the order is not final. . . .

The order on appeal herein apparently determined the secured status of Bank of the West and O.H. Kruse in a chapter 11 bankruptcy case, prior to confirmation. While the order on appeal does not on its face indicate that there are any issues reserved for future disposition, the bankruptcy docket indicates that plan confirmation proceedings are pending and that both Bank of the West and O.H. Kruse are opposing Debtors' plan. It is unclear whether the confirmation proceedings might affect the scope of the order on appeal.

Any party to this appeal shall have FOURTEEN (14) DAYS from the file-stamped date of this order to file and serve a paper addressing the finality issue. . . .

Clerk's Order Re Finality Issue (December 5, 2002).

Debtors and Ferndale apparently accepted the Clerk's analysis that the order on appeal was interlocutory and did not respond, resulting in dismissal of the appeal. Unfortunately, the dismissal was on the basis of lack of prosecution rather than on the jurisdictional basis. *See* Fed. R. Bankr.P. 7041/Fed. R. Civ. P. 41(b) (involuntary dismissal for lack of jurisdiction is not on the merits).

Since the appeals should not have been so dismissed, we therefore agree with the reinstatement of the 2002 appeals, as reflecting the panel's real intentions that the appeal would proceed once a final order was entered.

■■■ Furthermore, the doctrine of unique circumstances excuses untimeliness when the appellants have relied upon the panel's action. *See In re McAuley v. Orange Coast Thrift & Loan Ass'n (In re McAuley),* 66 B.R. 696, 700 (9th Cir. BAP 1986). In 2002 and for more than a year thereafter, the appellants were led to believe that their original appeals were interlocutory. *See* Tr. of Proceedings (March 20, 2003), at 43–44 (counsel informing bankruptcy court that the appeals had been dismissed for lack of a final order.) Then, after the case had been dismissed, the appellants were told that those appeals were not interlocutory, after all. Due to the confusion, the appellants had to cover all their bases and file new appeals in 2003. Debtors and Ferndale relied, in good faith, on the panel's judicial action in renewing their appeals in 2003. Therefore, both the 2002 and 2003 appeals will stand as timely filed.

## II. Merits of Order Re Secured Status

### (a) Bank's Security Interest

Debtors and Ferndale challenge the ruling that Bank has a valid and perfected security interest in the Settlement Proceeds. See page 5, *supra.* Debtors contend that the Geitzen Lawsuit was a commercial tort action and, therefore, that UCC Article 9 was inapplicable.

It was undisputed that Bank would have a security interest in the Settlement Proceeds if the Geitzen Lawsuit were a contract action. It was also undisputed that, if the Geitzen Lawsuit were a tort action, it would fall within the meaning of a "commercial tort" as that term is used in re-

vised Article 9.[13]

■ Debtors, Ferndale, and the bankruptcy court painstakingly analyzed whether the Geitzen Lawsuit was a breach of contract or a commercial tort action, because, in some situations, a commercial tort is excluded from Article 9, such as under the definitions of "general intangibles" and "after-acquired" property.

Article 9 defines "general intangible" as follows:

> "General intangible" means any personal property, including things in action, **other than** accounts, chattel paper, **commercial tort claims**, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

Idaho Code § 28–9–102(a)(42).

"Commercial tort claims" are not considered to be "general intangibles" because, under the revised Article 9, they are a new category of collateral unto themselves. *See* Idaho Code § 28–9–102(a)(13); § 28–9–109(d)(12) (excluding "an assignment of a claim arising in tort, other than a commercial tort claim").

■ In addition, an after-acquired property clause cannot reach future commercial tort claims. *See* Idaho Code § 28–9–204(b)(2). For a security interest in a tort claim to attach, the claim must be in existence when the security agreement is created. Therefore, Bank could not have had a security interest in the after-acquired Geitzen Lawsuit itself if it were determined to be a commercial tort claim.

■ Bank responds that any such analysis is irrelevant, because the UCC plainly provides that the Settlement Proceeds were "proceeds." Article 9 provides two ways to capture settlement proceeds of a lawsuit involving damage to collateral. First, if there is a perfected security interest in after-acquired "general intangibles," then once the lawsuit is settled for money, the debtor's right to payment becomes transformed into a "payment intangible" to which the tort exclusion simply does not apply. Second, lawsuit settlement funds stemming from destruction of collateral are considered to be proceeds of the original, damaged collateral. Therefore, we agree with Bank that the Settlement Proceeds were its "proceeds" based on the following analysis.

#### (I) Payment Intangible

■ Revised Article 9 created a new subcategory of "general intangible" called a "payment intangible," which is defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation." Idaho Code § 28–9–102(a)(61). The authorities hold that it is irrelevant whether the payment intangible is based on a tort lawsuit, because the collateral does not consist of the *claim*, but, rather, the contractual right to payment evident in any settlement involving destruction of collateral. Addressing the scope of Article 9, § 28–9–109 provides

---

13. The bankruptcy court presumed that the tort counts came within the special category of a "commercial tort," and we agree. *See Wiersma,* 283 B.R. at 300. In Idaho, it is defined as follows:

"Commercial tort claim" means a claim arising in tort with respect to which:
 (A) the claimant is an organization; or

(B) the claimant is an individual and the claim:
(i) arose in the course of the claimant's business or profession; and
(ii) does not include damages arising out of personal injury to or the death of an individual.

Idaho Code § 28–9–102(a)(13).

that, although it does *not* apply to "[a]n assignment of a claim arising in tort, other than a commercial tort claim," yet "sections 28-9-315 and 28-9-322 apply with respect to proceeds and priorities in proceeds." *See* Idaho Code § 28-9-109(d)(12).

The Official Comment to this section provides:

> Tort Claims. Subsection (d)(12) narrows somewhat the broad exclusion of transfers of tort claims under former Section 9-104(k). This Article now applies to assignments of "commercial tort claims" (defined in Section 9-102) as well as to security interests in tort claims that constitute proceeds of other collateral (e.g., a right to payment for negligent destruction of the debtor's inventory). *Note that once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort.*

*Id.*, cmt. 15 (emphasis added).

▮▮▮ In other words, revised Article 9 considers payment intangibles of either consumer or commercial tort actions to be general intangibles. Once the payment intangible comes into existence, in this case as an after-acquired settlement fund general intangible, it is automatically within the scope of Article 9 as part of the secured creditor's collateral.

▮▮▮ "The purpose and effect of these revisions are to enhance certainty so that lenders will be willing to provide more credit on the basis of these types of personal property when they are provided as collateral." David A. Lander, "Understanding the Expanded Scope of Revised Article 9 of the UCC," 9 *Norton Bankr.L. Adviser* 1 (2000). It makes sense that the settlement fund should be within the scope

of Article 9, "because streams of payment from structured settlements are assigned outright or pledged as collateral in zillions of transactions around the country." Barkley Clark & Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, vol. 1, § 1.08[11][B], p. 1-270.4 (2004).

The Ninth Circuit Court of Appeals came to the same conclusion, *in dicta*, in *Fifteenth RMA Partners, L.P. v. Pac./ West Communications Group, Inc. (In re Pac./West Communications Group, Inc.)*, 301 F.3d 1150 (9th Cir.2002) (examining identical California UCC provisions). The issue there was whether "a creditor with a security interest in another's personal property, including general intangibles, and all proceeds thereof, can attach its interest to the proceeds [arbitration award] of a commercial tort claim . . . ." *Id.* at 1151 (alteration added).

The court applied the former UCC § 9-104(k), which prohibited as collateral "[a] transfer in whole or in part of any claim arising out of tort," and held that the security interest could not attach to the proceeds. *Id.* at 1152-54. The court opined that the outcome would have been different under the revised UCC § 9-109, which "now allows a security interest to be attached to the *proceeds* of a tort claim." *Id.* at 1152 (emphasis in original).

In summary, Debtors' argument that the Settlement Proceeds are excluded from Bank's security interest is based on pre-revision case law. The plain language of the current statutes provides that Bank has a security interest in the Settlement Proceeds characterized as after-acquired collateral. We therefore affirm the bankruptcy court's conclusion on this other ground. *In re Bankruptcy Petition Preparers*, 307 B.R. 134, 140 (9th Cir. BAP 2004) (a reviewing court may affirm on any basis supported by the record).

#### (ii) Livestock Collateral Proceeds

Alternatively, the bankruptcy court determined that a monetary settlement of a claim for defective electrical work, which harmed and destroyed the livestock collateral, constituted "proceeds" under Idaho Code § 28–9–102(a)(64).[14] Since Bank's security interest in the cows was perfected, so too was the interest in the proceeds under § 28–9–315(a)(2), providing that "[a] security interest attaches to any identifiable proceeds of collateral".

■ Ferndale maintains, however, that the Settlement Proceeds emanated from the insurance coverage of Geitzen's wrongful acts, not damage to the cows. This argument is unpersuasive.

■ It is clear that rights arising from loss or damage to collateral are "proceeds," whether or not insurance covers the loss:

> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral;

Idaho Code § 28–9–102(a)(64)(D). Moreover, in this case the insurance provides only the source of the settlement funds, and, in itself, is not replacement collateral.

The Ninth Circuit has held that legislative intent was to give "proceeds" "the 'broadest possible definition.'" *Pac./West Communications Group*, 301 F.3d at 1153 (quoting *Nolin Prod. Credit Ass'n v. Stone*

(*In re Stone*), 52 B.R. 305, 307 (Bankr. W.D.Ky.1985)). The nature of Bank's transaction with Debtors was extensive and related to the complete dairy operation. "Proceeds" under such a scenario must apply in a broad sense in order to compensate the secured creditor.

In an analogous case from Washington state, it was held (under former Article 9) that "proceeds" of a dairy herd logically encompassed government payments pursuant to a federal dairy termination program which required the slaughter or export of the cattle. The state Supreme Court opined:

> The granting of a security interest in a dairy herd, together with the product and proceeds thereof, obviously contemplates security in more than the individual cows. The herd represents a continuing source of production resulting in a repetitive income flow. This security is quite different from a security in a single crop to be harvested and sold, or cattle which are raised only for slaughter for meat. It was this type of collateral which debtors have destroyed and removed from Bank's security interest
> . . . .

*Rainier Nat'l Bank v. Bachmann*, 111 Wash.2d 298, 302, 757 P.2d 979, 981–82 (1988).

Also, *Stone* was cited approvingly in the Ninth Circuit's analysis of the current UCC in *Pac./West Communications Group*, 301 F.3d at 1154. *Stone* concerned

---

14. "Proceeds" are defined as the following property:
 (A) Whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral;
 (B) whatever is collected on, or distributed on account of, collateral;
 (C) rights arising out of collateral;
 (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
 (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.
Idaho Code § 28–9–102(a)(64).

a debtor's tort action for negligence against a veterinarian, an animal clinic, and a laboratory, for the loss of 300 cattle. The bankruptcy court, there, also applied a broad definition of proceeds and held that the settlement monies for the damage to the cattle were proceeds. *Stone*, 52 B.R. at 308.

The Settlement Proceeds, therefore, are "proceeds" covered by Bank's security interest, but only to the extent of the value of the original collateral. *See* Idaho Code § 28–9–102(a)(64)(D). On this point, we reject Ferndale's contention that the damages associated with the cows is less than the $1.6 million net Settlement Proceeds.

Debtors summarized their losses as follows:

| | |
|---|---|
| Milk loss—cows in herd | $2,289,473.00 |
| Excess Replacements | 1,036,225.00 |
| Quality loss | 613,232.00 |
| Diminished herd size | 393,925.00 |
| Miscellaneous costs | 217,935.00 |
| Future losses | 1,200,000.00 |
| Labor | 71,100.00 |
| TOTAL | $5,821,890.00 |

Stipulation of Facts (July 30, 2002), Exh. G–2.

Debtors further provided a description of the losses in each category. The "milk loss," "excess replacements," "quality loss" and "diminished herd size" damages obviously relate to the cows. Those damages exceed $3 million, whereas Debtors' interest in the Settlement Proceeds is $1.6 million. Moreover, a review of the "miscellaneous costs," "future losses," and "labor" categories reveals that these losses are also related to expenses caused by the injury to the cows. All of Debtors' claims against Geitzen arose out of the loss of, or damage to, the cows because the cows were "the locus [and measure] of that loss." *McGonigle v. Combs*, 968 F.2d 810, 828 (9th Cir.1992) (alteration added).

In *McGonigle*, an investor borrowed money to purchase stock in a thorough-bred farm and the lender retained a security interest in the stock. The stock value plummeted two years after the purchase, and the investor sued the farm managers, an appraiser and the lender. When the managers and the appraiser settled with the investor, the lender asserted a security interest in the settlement funds, contending the money was "proceeds" of the stock. *McGonigle*, 968 F.2d at 815, 827. The Ninth Circuit agreed, holding that "[t]he locus of that loss was in the secured stock, and Central Bank as security holder is entitled to its lien on the settlement payments that were intended to compensate for that lost value." *Id.* at 828. The same rationale applies in the instant case.

A few calculations reinforce the bankruptcy court's determination that the Settlement Proceeds were Bank's "proceeds." For example, the bankruptcy court determined that a commercially reasonable price for 480 cows that were liquidated by Bank was $650,000. *See* Mem. Dec. (Feb. 11, 2003), at 24–27. Based on that figure, each of Debtors' cows was worth approximately $1,354. If we divide the net Settlement Proceeds ($1,698,391) by the remaining 1,520 cows (from a herd of 2000), the result is a value of $1,117 per cow. The net Settlement Proceeds, therefore, approximate the value of the lost cows ($1,354 compared to $1,117).

In addition, the bankruptcy court found that in a good market a healthy cow would bring $1,600 to $2,000 per head. *See id.* at 18. Dividing 1,520 cows into the gross settlement amount of $2.5 million yields a fair market value of $1,645 per cow. Thus, the Settlement Proceeds are consistent with, and roughly equivalent to, the value of Bank's damaged herd collateral.

In summary, the bankruptcy court correctly determined that Bank had a valid and perfected security interest in the Set-

tlement Proceeds as UCC "proceeds" of its lost collateral. Furthermore, based on its remaining $2.2 million secured claim, Bank's interest would encumber the entire $1.6 million net Settlement Proceeds, and would come entirely ahead of Ferndale's junior interest.

### (b) Ferndale's Secured Interest

Debtors also object to Ferndale's security interest solely on the same grounds: that it could not take a security interest in a tort action. The bankruptcy court determined that Ferndale had a valid security interest in the Settlement Proceeds.

The undisputed facts of this appeal show that Bank's secured claim of approximately $2.2 million encumbers the entire $1.6 million Settlement Proceeds. Therefore, because Ferndale is junior to Bank, it has no secured interest in the Settlement Proceeds and is entirely unsecured.

 We examine our own jurisdiction *de novo*. *Ernst & Young v. Matsumoto (In re United Ins. Mgmt., Inc.)*, 14 F.3d 1380, 1383 (9th Cir.1994). Ferndale's appeal of the Order Re Secured Status presents no live case or controversy. Moreover, in light of our inability to effectuate any meaningful relief as to Ferndale, its appeal is also moot. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 493–94 (9th Cir. BAP 2003). We must therefore dismiss Ferndale's appeal as moot.

### III. Approval of Settlement Agreement
(BAP No. 03–1215)

Debtors contend that the bankruptcy court's order approving the settlement agreement between Debtors and Geitzen should be reversed. They maintain that a copy of the agreement was not mailed to all creditors and interested parties and, as a result, the court's order was inconsistent with the properly noticed motion. The original motion, they contend, proposed to use the Settlement Proceeds to purchase cows, while the final, signed agreement and order approved a settlement for cash.

 Bank responds that the appeal of the settlement order is moot. We agree. An appeal is moot if events have occurred after the entry of the order being appealed that prevent the panel from granting effective relief. *See id.*

 Here, following the bankruptcy court's order approving the settlement, the parties fully released their claims, dismissed the claims with prejudice, and Geitzen and its insurer paid over the settlement funds jointly to Debtors and Bank. *See* Bank Responsive Brief (May 21, 2004), at 14–15 & n. 32. Geitzen is no longer before the bankruptcy court or this panel. Moreover, the bankruptcy case has been dismissed, and we herein affirm the dismissal. Therefore, we dismiss Debtors' appeal as to the order approving the settlement as moot.

### IV. Denial of Plan Confirmation
(BAP No. 03–1215)

Debtors timely appealed the bankruptcy court's order denying confirmation of their Second Amended Plan, which interlocutory order merged into the final order dismissing their bankruptcy case. They challenge the following two grounds for denial.

### (a) Cows for Cash: Failure to Provide Bank with the "Indubitable Equivalent" of its Claim

 Debtors attempted to cram down the Second Amended Plan over Bank's objection. Before the bankruptcy court may consider cramdown, all of the applicable requirements of § 1129(a), excluding § 1129(a)(8), must be met. *See* 11 U.S.C. § 1129(b)(1).

Debtors challenge the bankruptcy court's finding that their plan to purchase replacement cows with the Settlement Proceeds was not "fair and equitable" under § 1129(b)(2)(A). The Code provides three examples of nonconsensual treatment of an allowed secured claim. The third treatment applies to our facts.[15] It provides:

> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(iii).

The Code does not define "indubitable equivalence." The phrase was coined by Judge Learned Hand in *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941 (2d Cir.1935). In rejecting a plan, Judge Hand stated:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders,

unless by a substitute of the most indubitable equivalence.

*Id.* at 942.

Paraphrasing Judge Hand's words, the Ninth Circuit in *Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426 (9th Cir. 1984),[16] stated:

> Judge Hand concluded that the creditor's right "to get his money or at least the property" may be denied under a plan for reorganization only if the debtor provides "a substitute of the most indubitable equivalence." Such a substitute clearly must both compensate for present value and insure the safety of the principal.

*Id.* at 433.

 The two components, of compensation and safety, require an analysis that focuses on the value of alternative collateral and a comparison of risks imposed on the creditor. "[S]trict cash equivalence" is not necessary. *See Metro. Life Ins. Co. v. San Felipe @ Voss, Ltd. (In re San Felipe @ Voss, Ltd.)*, 115 B.R. 526, 530(S.D.Tex.1990) (exchange of real property for stock with built-in equity margin was indubitable equivalent). "[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase

---

**15.** The first treatment is that the secured creditor must retain its lien in the property and also receive "deferred cash payments totaling at least the allowed amount of such claim, of a value as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." § 1129(b)(2)(A)(i). This treatment does not apply to our facts, since the original cows are gone. The second treatment pertains to a sale of the collateral, which also is inapplicable here. *See* § 1129(b)(2)(A)(ii); *see generally* 7 *Collier on Bankruptcy* ¶ 1129.05[2][a]-[c], at 1129-130.1 to 140 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2004).

**16.** *Am. Mariner Indus.*, which held that the term "indubitable equivalent," as used in the adequate protection provisions of § 361(3), meant that an unsecured creditor was entitled to receive lost-opportunity payments, was effectively overruled on other grounds in *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 368, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *see also Cimarron Investors v. Wyid Props. (In re Cimarron Investors)*, 848 F.2d 974, 976 (9th Cir.1988).

the creditor's risk exposure." *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1422 (9th Cir.1996) (citation omitted).

Evaluating a "dirt for debt" plan, the Ninth Circuit, in *Arnold and Baker Farms*, held that a debtor's proposal to surrender a portion of a larger tract of land to secured creditor in full satisfaction of the lien was not the indubitable equivalent because of the highly speculative valuation of the land. *See id.* at 1421–22. In another case, the bankruptcy court denied plan confirmation where the debtor planned to replace a lien on livestock and crops with a lien on future crops. The court found that the substitute lien created too much risk for the creditor. *See In re Hoff*, 54 B.R. 746, 753–54 (Bankr.D.N.D. 1985).

■ We have held that indubitable equivalence exists when (1) the proposed plan is feasible ("not wholly speculative"); (2) it is unlikely that the creditor's claim "would ever become even partially unsecured"; and (3) it is "likely that the value of the property will increase." *Pine Mountain*, 80 B.R. at 174–75.

■ Debtors' argument here bootstraps their appeal of the settlement order: they maintain that the settlement for cows (cows for cows) would have been the indubitable equivalent of Bank's secured claim. However, the settlement was approved for cash, rather than for cows. Debtors present little argument on appeal that the replacement cows are the indubitable equivalent of cash. As the Bank aptly recognized: "[C]ash is king." Bank's Responsive Brief (May 21, 2004).

Moreover, considering the enormous risk to Bank inherent in new cows, not in Idaho, but in a startup operation in Georgia, such a settlement would hardly be the indubitable equivalent. The value of Bank's cash collateral was $1.6 million. Debtors presented evidence that the value of the 800 cows to be purchased in Georgia was approximately $1.4 million. Therefore, Bank's cash collateral essentially would be used up in the initial livestock investment, in what the bankruptcy court called "a forced extension of venture capital to a startup concern." Mem. Dec. (Feb. 11, 2003), at 48. And that extension would be at a loan-to-value ratio of 100%.

Even though Bank was to be given a lien in the milk and milk products, such product depends on the condition of the cows. Bank would be required to assume all of the risk of loss to the cows, including their well-being, sickness, and death. Debtors testified that they would keep the new herd at the same number, but the Second Amended Plan did not provide a lien for Bank in after-acquired cows. Debtors' ability to purchase replacement cows would depend on their cash flow; cows cost anywhere between $1,400 to $1,600 per head. *See* Tr. of Proceedings (Dec. 31, 2002), at 63–64. Also, Debtors did not argue that the bankruptcy court erred in finding that they would have very little, if any, net income, or any surplus for emergencies or unforeseen problems.

Given this scenario, the startup dairy, relocation to another part of the country where Debtors had not worked before, and their lack of capital, the bankruptcy court did not err in determining that the plan did not provide Bank with the indubitable equivalent of its cash collateral.

### (b) Feasibility

Debtors also contend that the bankruptcy court erred in finding that the Second Amended Plan was not feasible.

■ Under the feasibility requirement of § 1129(a)(11), Debtors must demonstrate that the plan "has a reasonable

probability of success." *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 787 F.2d 1352, 1364 (9th Cir.1986). The proposed plan must not be a visionary scheme which promises more than the debtor can deliver. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985).

■ Several factors are relevant to whether a plan is feasible including: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Sagewood Manor Assocs. Ltd. P'ship,* 223 B.R. 756, 763 (Bankr.D.Nev.1998).

Debtors contend that the bankruptcy court erred as a matter of law by holding that a startup dairy could not be feasible. They do not dispute the court's findings of facts, but rather the determination that the plan was not feasible.

■ First, the record and the court's decisions do not reflect any error of law; the bankruptcy court applied the correct standard for determining feasibility under § 1129(11). Whether that determination was erroneous is a question of fact. *Acequia,* 787 F.2d at 1358. Under the clearly erroneous standard, we must give due regard to the bankruptcy court's evaluation of witness testimony and any inferences drawn by the court. *See Beech Aircraft Corp. v. United States,* 51 F.3d 834, 838 (9th Cir.1995).

■ The bankruptcy court stated that the feasibility of Debtors' plan was a "close call." Mem. Dec. (Feb. 11, 2003), at 54. It was appropriately troubled by the following undisputed facts: (1) relocation to a completely different climate and the effect on the dairy business; (2) a new business environment, new employees and new market, and accompanying personal changes; (3) a different milk product (fluid form in Florida versus product for cheese in Idaho); (4) startup business with no substantial capital reserves; (5) high level of debt service; and (6) seven-year repayment plan for Bank with a balloon payment, the source of which was nebulous.[17]

Debtors presented detailed testimony and documentation which showed that they would be able to meet their expenses and debt service in the beginning. However, there were many uncertainties evident from the testimony of Debtors' witness, Robert Matlick. Although the price for milk might be higher in the South, Mr. Matlick testified that milk production was lower partly due to heat and humidity. He also testified that Debtors, who planned to take over the operation of an existing dairy in Georgia, projected they would have greater milk production, and therefore income, by milking the cows three times a day instead of two. Yet, Debtors had no experience dairying in the South, nor any realistic basis to conclude that a more aggressive milking schedule would produce either more milk or more income.

Debtors' optimistic projections for future success in their new dairy might have been possible, but they were neither reliable nor convincing. There was no persuasive evidence that Debtors could main-

---

**17.** Additionally, Debtors' attorney had testified that there would be tax consequences for the estate, due to the settlement for cash, in the approximate amount of $281,000. *See* Tr. of Proceedings (March 20, 2003), at 17. Such a new tax liability would reduce available cash resources.

tain the seven-year payment plan or earn enough excess income to make the balloon payment. There was also no evidence to show that they could weather a period of underachievement or any large-scale problems with the new dairy, new employees, or new cows.

While the plan may not have been wholly speculative, that it was uncertain was beyond argument. Therefore, our review of the record does not leave us with a "definite and firm conviction that a mistake has been committed." *United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. 525. We conclude that the bankruptcy court's findings as to feasibility were not clearly erroneous.

### V. *Dismissal—§ 1112(b)*
(BAP No. 03–1215)

Finally, the bankruptcy court gave Debtors the opportunity to file a Third Amended Plan, which they indeed filed (apparently along with new documentary evidence). Debtors also filed a § 506(c) motion to surcharge the collateral, as well as a motion for equitable removal of Bank's lien on the after-acquired property under § 552(b). Although the bankruptcy court did not hear the merits of those motions (and they are not included in the excerpts of record), nevertheless, the bankruptcy court considered their impact and that of the proposed Third Amended Plan on Debtors' ability to reorganize.

Debtors contend that the court abused its discretion by dismissing the case without holding another complete confirmation hearing on their Third Amended Plan.

Pursuant to § 1112(b), the bankruptcy court may dismiss a case for "cause" including "inability to effectuate a plan," or "denial of confirmation of every proposed plan and denial of a request made for additional time for filing another

plan or a modification of a plan." 11 U.S.C. § 1112(b)(2), (b)(5). These enumerated causes are nonexclusive. *St. Paul Self Storage Ltd. P'ship v. Port Authority (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580, 584 (9th Cir. BAP 1995).

Debtors' proposed Third Amended Plan attempted to address the bankruptcy court's concerns. For example, Debtors reduced their monthly debt service by about $2,600, and obtained a loan for $60,000 for startup costs. However, these new monies were insignificant considering the proposed total monthly expenses and debt service. In addition, Debtors proposed to give Bank a total of $210,000 cash ($160,000 plus $50,000 from an equity loan). A $210,000 cash equity cushion was inadequate protection, however, considering that Bank assumed all of the risks of losing its $1.4 to $1.6 million security.

Debtors also proposed to enhance Bank's collateral position by granting Bank a lien in the new cows and "all livestock replacements" as well as in milk and milk proceeds. However, Bank continued to object to its treatment under the Third Amended Plan and to the plan's feasibility.

Finally, Debtors have not challenged the bankruptcy court's observations that any estimated § 506(c) surcharge and § 552(b) deductions from Bank's claim would likely far short of Debtors' projections.

In summary, Debtors' new proposals were nothing more than "beating a dead horse" (or here a dead cow), and did not remove the court's substantial doubt as to whether Bank was receiving its indubitable equivalent, nor did they improve significantly the likelihood of success of the new plan when it was reviewed in context. In a year and a half, Debtors had proposed

four separate plans, but were unable to achieve either a consensual or crammed-down confirmation with respect to their largest creditor. *See* Tr. of Proceeding (March 28, 2003), at 11:7–11. Since the facts were not disputed, the bankruptcy court did not abuse its discretion in denying Debtors another chance at plan confirmation and finally dismissing the case.

### CONCLUSION

Bank's security interest extended to Debtors' interest in the Settlement Proceeds, and the Order Re Secured Status is AFFIRMED as to Bank. Because no collateral exists to satisfy any part of Ferndale's junior secured interest, its appeal is hereby DISMISSED as moot.

Debtors' appeal of the order approving the settlement for cash is also DISMISSED as moot, as circumstances have changed so radically as to prevent us from being able to grant any meaningful relief.

Debtors' Second Amended Plan satisfied neither the "fair and equitable" rule of § 1129(b)(2)(A)(iii) nor the feasibility requirement of § 1129(a)(11), and the court's denial of confirmation is therefore AFFIRMED.

In the absence of a confirmable plan, the bankruptcy court's order dismissing the chapter 11 case is also AFFIRMED.

BRANDT, Bankruptcy Judge, dissenting in part.

While I join the balance of the foregoing opinion, I respectfully dissent from part I of the discussion, respecting our jurisdiction. I do not see any mistake in the prior dismissals: although the clerk's notices were based on the incorrect premise that the order was interlocutory, Debtors and Ferndale were asleep at the switch.

There was neither an inadvertent misapprehension of the facts, nor did the initial dismissals not reflect the panel's real intentions. The unique circumstances exception does not work because the premise, that the order was interlocutory, was not a panel determination. Rather it was in essence a query, and appellants were invited to show the premise incorrect. When they did not respond, the prior appeals were properly dismissed.

I would dismiss the appeals of the Order Re Secured Status as untimely.